MR. JUSTICE HARRISON
delivered the opinion of the Court.
*41 Plaintiff, Dennis Kuiper, brought a products liability action against the Goodyear Tire and Rubber Co. (Goodyear) after he was injured while working on a multi-piece truck wheel rim. Following a twenty-five day trial in the Eighth Judicial District Court for Cascade County, the jury awarded plaintiff $325,000 in compensatory damages and $1,500,000 in punitive damages and judgment was entered based upon the jury verdict. The District Court denied a new trial. Goodyear appeals. We reverse and remand for new trial.
On August 13, 1979, plaintiff, a twenty-two year old newly married man, was employed at an independent Goodyear dealership in Great Falls, Montana, known as Andy’s D & K. He had been employed for only a short period of time and was working in the shop as a tire repairman, called a tirebuster. Late in the afternoon of August 13, the service manager instructed Kuiper to do a flat repair on a multipiece truck tire with a rim known as a Goodyear K-28. Kuiper had never worked on that type of a wheel, so a coworker, David Huston, helped Kuiper dismount the tire, repair the tube, and instructed Kuiper how to put the tire and rim back together. Huston left to work on another project, and Kuiper assembled the rim and tire and inflated the tire in a safety cage. After the tire was inflated, Kuiper rolled the tire to the truck and proceeded to mount the tire and wheel on the wheel lugs. As he was mounting the tire and wheel the ring explosively separated from the rim base and struck Kuiper in the face. Kuiper suffered multiple facial fractures, jaw fracture, loss of teeth, diploplia of the right eye, facial paralysis and a cerebral contusion. Doctors testified that as a result of these injuries, Kuiper continued to suffer from facial paralysis, loss of sense of smell and taste, loss of memory and concentration, anxiety, depression and traumatic neurosis. Medical evidence was conflicting as to whether Kuiper had suffered organic brain damage.
After partial recovery, Kuiper returned to work at Andy’s *42 D & K as a salesman. He was unable to function as a salesman due to memory lapses and loss of concentration. He next returned to work in the shop but was unable to cope with the anxiety he experienced while working there. Following medical recommendations that he should change occupation, Kuiper enrolled at a vocational technical school in Missoula studying forestry.
On December 28, 1979, Kuiper filed a complaint in District Court against Goodyear. The complaint sought damages from Goodyear as the designer and manufacturer of the K-type wheel, for strict liability for defective design, failure to warn, manufacturing defect and malicious conduct.
Because the case is returned for new trial, we need not review the extensive factual record. Our factual review will be brief with the aim of illustrating the contentions of the parties. The wheel which separated and caused Kuiper’s injury is a Goodyear K-type-28, manufactured in March, 1944. The wheel has two parts: (1) a split base (2) a combined slide ring and locking ring. Plaintiffs mechanical engineer witness testified that the most probable cause of the separation was the absence of a portion of the gutter hook on the split base which serves to hold the slide ring and locking ring in place when the parts are assembled and the tire is inflated. That witness testified that the missing portion of gutter hook was a manufacturing defect which may have been increased with the usage of the wheel, and he further testified that the lock ring was manufactured .032 of an inch too large. He also testified that the missing gutter hook and oversized ring caused the unsafe assembly which explosively separated while Kuiper was mounting the wheel on the truck. He further testified that a locking device patented to Goodyear in the 1930’s could have been placed on K-type wheels to decrease the risk of explosive separation.
Goodyear presented expert testimony that the K-type wheel was not defectively designed and that the wheel involved in Kuiper’s accident was not defectively manufac *43 tured. Goodyear experts testified that the missing gutter hook was caused by wear and that Kuiper should have recognized the dangerous condition of the wheel and not reassembled it. Such experts testified that the K-type wheel is a safe wheel if properly maintained and assembled according to Goodyear’s instructions. A Goodyear witness, tire supervisor for a Georgia express company, testified the K-type wheel is safe if properly maintained and assembled, although he testified that his shop had two accidents involving K-type wheels caused by improper mounting procedures.
Kuiper introduced evidence of other accidents involving multi-piece wheels in general and K-type wheels in particular. One exhibit reveals that as of May 1981, Goodyear had notice of as many as eighty six other reported accidents involving K-type wheels. No evidence was introduced showing exactly how other accidents occurred, nor the age or condition of the exploding wheels. Plaintiff introduced an interoffice memo written by a manager of field engineering of the motor wheel division of Goodyear in which he stated that parts of the multi-piece rim are inherently dangerous both on the highway and in the shop. He said the parts “sometimes catastrophically cease to serve their intended purpose” and that “the time at which the usefulness ceases is dependent on chance, service procedure, maintenance, proper use of tools, and the use, abuse and misuse of which parts have been subjected during their lifetime.” That witness estimated the useful life of the average K-type wheel at twelve to fourteen years. The wheel involved in this case was approximately thirty-five years old.
It is significant to note that Goodyear ceased production of the K-type wheel in 1968, prior to any of the incidents referred to in the trial of the case.
With regard to the Goodyear policy of notifying tire repair shops of the necessity of using care in handling the wheels, Goodyear presented evidence showing that Goodyear had distributed a multitude of charts, posters and advertise *44 ments which demonstrated the proper assembly of multipiece rims. A Goodyear witness testified that the charts, posters and advertisements warn that multi-piece rims can be dangerous if they are not properly assembled or if the parts are worn or abused. Goodyear also had available a film entitled, “You May Not Get a Second Chance” which showed explosive separation of a multipiece rim. The film was shown at some seminars and was available to independent dealers for a fee. The service manager at Andy’s D & K testified there was some of the multi-piece warning posters and literature in the shop, but he did not recall exactly which ones.
In 1977, during the administration of President Carter and subsequent to the problems of the Nixon administration which are later discussed, the Director of the Office of Defects Investigation of the Department of Transportation reopened the K-type wheel investigation. In November, 1979, he transmitted a letter to the Vice President of Goodyear stating:
“By 1973, inclusive, we have identified at least forty-two accidents and twelve deaths involving the explosive disassembly of K-type rims. All types of multi-piece rims can be subject to a variety of servicing procedures, including the use of warnings, corroded or mismatched parts. When recognizing this, the significantly higher number of accidents found among K-type rims is totally unacceptable and points to an inherent safety defect in these rims.”
He requested Goodyear to notify him within seven working days whether they would conduct a safety recall. Goodyear responded to that request stating they would attempt to recall the K-type wheels rims by replacing, without charge those manufactured in 1968 or purchased after January 1, 1971. Wheels manufactured prior to 1968 could be replaced with a new type rim at a discounted price. The recall was unsuccessful. Originally Goodyear offered ten percent of cost discount and later raised that to twenty-five percent.
Following are the issues:
*45 1. Did the trial court err in admitting the following irrelevant and prejudicial evidence in connection with the plaintiff’s allegations of political bribery and lying to the Ervin Committee:
(a) the political campaign contributions by Goodyear; (b) all of plaintiff’s references to Watergate;
(c) the DeYoung videotape?
2. Did the trial court err in admitting the following irrelevant and prejudicial evidence of other accidents:
(a) documents mentioning other accidents dissimilar to the plaintiff’s accident;
(b) testimony by Youngdahl from a document identified as Phase III;
(c) a video-taped dramatization of other accidents, which was shown to the jury;
(d) the Brandford letter?
3. Did the trial court err in submitting instructions 13, 27 and 41 to the jury:
(a) were instructions 13 and 27 erroneous because they did not include “without substantial change in condition” as an essential element of plaintiff’s proof;
(b) did instruction 41 erroneously equate “unjustifiable conduct” with malice?
4. Did the trial court err in submitting the issue of “failure to warn” to the jury?
5. Was the jury verdict influenced by misconduct of the bailiff?
6. Was the jury verdict excessive, based on an unsupportedassumption, and inspired by passion and prejudice?
We will discuss those issues which require reversal or which may cause problems on retrial.
Issue 1 relates to plaintiff’s opening statement to the jury, plaintiff’s evidence and plaintiff’s closing argument with regard to an untaxed slush fund in a Swiss bank account used by Goodyear as contribution to CREEP (Committee to Reelect the President), extensive references, by name, to those persons involved in the Watergate scandal, with particular *46 emphasis upon those convicted of crimes in the Watergate scandal, a video-tape of Goodyear chairman DeYoung appearing on television before the Ervin Senate Committee tc discuss the campaign contribution, and the conviction of Goodyear in regard to that contribution.
The theory upon which the plaintiff contends that all of such matters are admissible is under Section 27-1-221, MCA, which provides that exemplary damages may be allowed where a defendant has been guilty of “oppression, fraud, or malice, actual or presumed.” The general standard for the recovery of punitive damages is restated in Graham v. Clarks Fork Nat. Bank (Mont.1981), 631 P.2d 718, 721, 38 St.Rep. 1140, 1143, 1144 to wit:
“. . . we stated the general rule respecting punitive awards:
“ ‘To warrant the recovery of such damages the act complained of must also partake somewhat of a criminal or wanton nature. And it is an almost universally recognized rule that such damages may be recovered in cases, and only in such cases, where the wrongful act complained of is characterized by some such circumstances of aggravation as willfulnes, wantonness, malice, oppression, brutality, insult, recklessness, gross negligence, or gross fraus on the part of the defendant.’ ” (emphasis added)
The Goodyear act complained of is the alleged defective design, to warn of manufacturing defect of the K-type wheel. The record fails to disclose any relationship between the political activities of Goodyear and the wheel case at issue here.
We recognize that the purpose of the opening statement is to inform the jury of the evidence to be presented to justify recovery and place it in perspective. In plaintiff’s opening statement, it is apparent that the intent was to persuade the jury that the criminal and wanton conduct of Goodyear in making its political contribution to CREEP and supporting the scandalous conduct of the Nixon administration, was a proper reason to conclude that punitive *47 damages shculd be awarded against Goodyear, regardless of the presence or absence of a direct connection to the design, production and manufacture of the K-type wheel. Plaintiffs opening statement to the jury filledapproximately seventy-two pages of transcript. Over forty of those pages are devoted to a recounting of the political slush fund, the contribution to the Nixon administration, and the Nixon Watergate scandal, with great emphasis placed upon the names of those who were convicted of various crimes in the Nixon administration. Following are illustrative portions of plaintiffs opening statement:
“. . . It developed that in the 1960’s, Goodyear, through their foreign affiliates in Europe, were getting kickbacks or rebates from suppliers to their foreign affiliates, and rather than report them honestly and on the books, they decided not to pay any tax, not to report them on their books, to issue by some kind of a financial controller’s gimick [sic] a bank check to the subsidiary and acquire the cash rebate. They were always paid in cash, and put it in a secret account that they set up with nothing but a code name. That code name of that account was Goyeda. That bank in Switzerland accumulated the cash then over a period of time. “One of the purposes, or the one we’re concerned with of that cash fund, was to build up a domestic political slush fund in this country . . . <<
“The opportunity to use it in influencing domestic politics arose either late 1971 or early 1972. . . ÍÍ
“. . . In December, 1971, the White House operative for personnel, the man who was doing the job in the federal government, he’s the key man, was Fred Malek . . .
“Fred Malek was on the Nixon White House Staff in the Office of Management and Budget as the personnel director. If you wanted a fat federal job, you saw Malek . . . you will recall that the Chief of Staff of Nixon’s White House was the gentleman named H. R. Haldemann. In December *48 of 1971, Malek suggested in a long memorandum, which is a public government record, that Haldemann allow Malek to set up a program, which he first talked about politicizing the bureaucracy, by which fancy words he meant, ‘We’re going to make the people who are civil servants in Washington and work in the departments such as the Department of Transportation, work for the re-election of the president.’
“They finally smoothed this out to a euphemism called the responsiveness program, by which they proposed to make the departmental people in the executive branch of government responsive to the President’s needs to be re-elected. And as you’ll all recall, Mitchell became the chairman of the committee that became notoriously known as CREEP, the Committee to Re-elect the President.
“He had been the Attorney General. Maurice Stans had been the Secretary of Commerce and became the Chairman of the Finance Committee to Re-elect the President . . . U
“In February, 1972, . . . Maurice Stans at a business counsel meeting in Washington meets Russell DeYoung. Who is he? Russell DeYoung is the Board Chairman of the Goodyear Tire & Rubber Company, and he asks Russell DeYoung if he can come and see him. The testimony will be DeYoung responds, ‘You don’t need to come and see me, I’ll send a man to see you.’ And he does.
“The man he sends is the man that’s in charge of the slush fund, Mr. Arden Firestone.
“DeYoung and Firestone agree that they’re going to contribute $20,000 to the request of Stans, and they hand-carry in cash $20,000 by way of courier, Firestone to the Office of the Finance Committee to Re-elect the President. <C
“When Firestone carries the money in the bag wrapped in brown paper, it is testified, to 1701 Pennsylvania Avenue and delivers it to the Committee to Re-Elect the President, Stans advises him that he is disappointed, it is not enough, *49 and sends him back to Akron for more. Firestone consults with Russell DeYoung and they agree between themselves they will add another $20,000 to the ante. And then DeYoung decides that he will add $3,000 of his own, and a check from his wife for two more. A total of $45,000. The other twenty comes out of a safe, and now they are up at $45,000. Firestone returns to Washington with the cash, delivers it to Stans, and it is accepted without comment. “Now, it develops that the Finance Committee to Re-elect the President is made up of, among other people, of Maurice Stans, of course, and a budget committee serving with him, and Magruder, and on the political committee is Fred Malek. . .
“. . . In January 1972, following the Nixon re-election, the president of the Union Oil Company, Claude Griniger, G-RI-N-I-G-E-R, I believe, became the Secretary of Transportation. His righthand man, Dr. James Gregory, became the Administrator of the National Highway Traffic Safety Administration. The other Secretary of Transportation, and the evidence will be that Mr. Malek proposed that we work through the undersecretary, he’s our man — the Undersecretary of Transportation, Egil Krogh. He — strange name, EG-I-L K-R-0-G-H, but pronounced like the bird. Egil Krogh had been in the Nixon White House Staff. He had been the man who organized the White House security force that became known as the plumbers.
“Egil Krogh acted under Secretary of Transportation through the spring of 1973, before the plumbers and the grand juries finally got to him.
“. . . In April 1973, fact, Common Cause, a consumer public interest group, following the burglary and the aftermath of the Watergate, files a lawsuit in the United States District Court for the District of Columbia against the Committee to Re-Elect the President.
“In April, they’re asking for records of the contributors to *50 the Finance Committee to Re-Elect before the April 7, 1973 deadline. . .
“Firestone advises him, we’ll have to get back to Stans. He talked to DeYoung. Stans and DeYoung conclude that they’ll give them some phoney names. Stans and DeYoung met with the executives of Goodyear, that included Mr. Pilliod, Mr. Lane, who is their public relations man, and others. They explained the situation, and those gentlemen agree that their names can be misrepresented as the contributors, when they didn’t give a cent of money. 66
“Well, by July, Common Cause, it now appears to the lawyer for the Finance Committee to Re-Elect, that the judge is going to make him reveal the records of who it was that gave this pre-April 7th money. Now, the only evidence, the only record of it, because they destroyed all the evidence, was a list prepared at F. CREEP, and sent down the street a block to 1600 Pennsylvania Avenue, addressed to Rosemary Wood, the personal secretary to Richard Nixon. That became know as Rosemary Smith, and Rosemary’s list was the only record of the contributors prior to April 7th, coding, cash or whatever. Goodyear employees appear on Rosemary’s list, which will be in evidence. 64
“Mr. Meyers and Mr. DeYoung and Mr. Firestone consult with outside counsel, and they decide the jig’s up, so they go to the Watergate special prosecutor, who you recall is Archibald Cox at the time, to his staff, and they tell their story.
“Archibald Cox charges Goodyear with violation of the federal election law, felony offense, or it could be a felony offense, and also charges Russell DeYoung with that same crime. . .
“On April 19, 1973, Russell DeYoung pleads guilty to violating the federal election law by giving the corporate contribution, and the Goodyear Tire & Rubber Company *51 pleads guilty to the same charge, or substantially the same. Those guilty pleas are a matter of record and they’ll be before you.
“Mr. DeYoung is subpoenaed [sic] to appear before the Irvin [sic] Committee, that’s the Committee of the Senate, Senate Select Committee on Presidential Campaign Activities. It’s chaired by Sam Irvin [sic] from North Carolina. He appears on November 15, 1973, and before the Irvin [sic] Committee and a television audience of 50 million, possibly including some of yourselves. He testifies under oath about the scenario of these payments.”
No statement was made by plaintiffs counsel in the opening statement to connect all of the foregoing to the Department of Transportation, the wheel investigation and this case. Goodyear moved for a mistrial at the conclusion of plaintiffs opening statement, on the basis that the plaintiff had failed to state sufficient facts to show any relationship to the actions of the Department of Transportation and its investigation of the K-type wheel. Counsel also argued that the plaintiff had not stated sufficient facts to show a basis for an award of punitive damages based on the political contribution issue. The District Court considered the objections and denied the motion stating in part:
“THE COURT: Okay. Well, I don’t need any further argument, gentlemen. There isn’t any question about it that references to Watergate and the participants in this thing is prejudicial. I agree with that, John [Goodyear’s counsel]. There’s just simply no question about that. Whether or not we can overcome that by admonitions and instructions to the jury from here on out remains to be seen.
“The difficulty I have with the motion for a mistrial is that granting that would prevent the plaintiffs from putting on their case, and they’ve got a right to their theory of the case.
“And accordingly, predicated upon that fact alone, the motion for a mistrial is denied. The same is denied, however, without prejudice to resubmit that motion or any *52 other relevant motion having to do with the prejudice or the removal of this particular issues from the case. Alright?”
From opening, through plaintiffs case-in-chief, to closing, plaintiff presented his theory of the Goodyear political contribution to the Nixon Administration in an unsuccessful attempt to tie the activities of the Nixon Administration to the investigation of the Kwheels. In addition to the motion for mistrial at the conclusion of the opening statement, Goodyear moved for mistrial at the close of plaintiffs evidence and again at the close of all evidence. All motions were denied.
The record shows that Goodyear admitted that it had plead guilty to making a contribution to CREEP, that those contributions were in violation of Title 18, U.S.C., Section 601, a misdemeanor, and Goodyear paid fines of $5,000 and $1,000.
Throughout the trial, plaintiff attempted to link the Goodyear contribution to an attempted avoidance of the recall of the K-type wheels. Testimony before the Senate Ervin Committee was shown to the jury, with emphasis on the efforts of Mr. Malek, a member of the Committee to Re-elect the President. Malek, who testified before the Ervin Committee, denied knowing of any situations in which proceedings before any department or agency were interfered with, influenced or obstructed.
Plaintiffs theory in offering evidence of the Goodyear contribution to the jury was to suggest that the contribution was made in order to prevent the K-type wheels from being recalled. It should be noted it was not until 1974, after the investigation had been closed, NHTSA (the National Highway Transportation & Safety Administration) was empowered to order any recall. In addition, even 1974 statutory change which allowed recall, NHTSA could order recalls only in situations where there had been a finding of safety-related defects. Up to the time of trial, there was never a finding by NHTSA that the Goodyear rims had a safety- *53 related defect.
Our careful review of the very extensive record, shows a total absence of evidence connecting the political contribution of Goodyear to the investigation by a federal agency of multi-piece rims of the type which injured the plaintiff. As a result, it is clear that the evidence of Goodyear’s contribution to the Committee to Re-elect the President was inadmissible under Rule 402, Mont.R.Evid.
In allowing the injection of the Goodyear political contribution, its criminal conduct in making that contribution, the Watergate scandal, and the references to the criminal participants in that scandal, the trial court allowed a relatively simple products liability case to become a political circus and denied the parties the right to a fair trial. We note that the jury split 8-4 on liability indicating it was rather close on the products liability questions. However, the vote for punitive damages was 12-0. This suggests improper influence of the jury on the punitive damage question.
In failing to exclude the prejudicial statements and prejudicial evidence, the trial court permitted the jury to indulge in improper speculation and guesswork contrary to our holding in Graham v. Rolandson (1967), 150 Mont. 270, 435 P.2d 263.
It has long been the law in Montana, that to sustain a recovery the evidence relied upon, whether direct or indirect, must be substantial — more than a mere scintilla. Escallier v. Great Northern Ry. Co. (1912), 46 Mont. 238, 127 P. 458; McIntyre v. Northern Pac. Ry. Co. (1920), 58 Mont. 256, 191 P.1065. A verdict cannot rest upon conjecture, however shrewd, nor upon suspicion, however well grounded. Olsen v. Montana Ore Purchasing Company (1907), 35 Mont. 400, 89 P. 731. In Monforton v. Northern Pac. Ry. Co. (1960), 138 Mont. 191, 211, 355 P.2d 501, 511, this Court held:
“The record presents no evidence whatever that appellee’s attention was distracted by the Cloyd car or that Monfor *54 ton, because of any distraction, failed to make the necessary look-out for the train. To find otherwise involves an assumption or inference based upon speculation or conjecture that the Cloyd car did distract his attention and the second assumption or inference based on the first, that this distraction was the cause of the failure of Monforton to discover the train’s approach. But under section 93-1301-1 to 4, and Fisher v. Butte Electric Ry., 72 Mont. 594, 235 P. 330, one inference cannot be drawn from any other inference or presumption.”
See also Graham v. Rolandson, supra; Hageman v. Townsend (1965), 144 Mont. 510, 398 P.2d 612.
In allowing this evidence to be admitted the jury was allowed to speculate concerning the government’s investigation into the K-type wheels, known as the IR-215 investigation, despite the fact that Goodyear voluntarily discontinued the manufacture of the K-type wheels three years earlier and despite the fact that NHTSA had no power to order any of those rims to be recalled. It allowed the jury to speculate about the Malek memorandum, and to surmise, with no evidentiary support, that Goodyear believed that there was a commitment by the White House prior to making its contribution. It allowed the jury to conclude, with no evidentiary basis, that unknown persons in the White House knew of Goodyear’s preferences and were in a position to order them to be carried out. It allowed the jury to think, despite all the evidence to the contrary, that Andrew Detrick was moved to the head of the Office Defects Investigation, the ODI, by the Secretary of the Department of Transportation at the direction of unknown White House employees. Finallyit allowed the jury to assume, with no evidence to support the assumption that Detrick closed the IR215 investigation in 1972 differently than those closed by his predecessor. We find no evidence to support these conclusions, much less proof that these inferences and conclusions are reasonable or even probable. The evidence of Goodyear’s contribution should not have been *55 submitted to the jury under Rule 402, Mont.R.Evid.
Unquestionably, the plaintiffs allegations of political bribery were prejudicial to the appellant Goodyear. Circumstances pertaining to the Watergate investigation and subsequent name dropping of the notorious parties had no connnection with the cause of action. As previously noted, the trial court observed, “advice of . . . mentioning Watergate and all the rest of it is inherently prejudicial.” The court also noted that the prejudice of putting such evidence before the jury outweighed its probative value.
As we review the order of the District Court in the present case, we conclude that it is possible that the trial judge misunderstood our holding in Kuiper v. The Dist. Court of the Eighth Judicial Dist. (Mont.1981), 632 P. 2d 694, 38 St.Rep. 1288. In that holding, we allowed the plaintiff considerable latitude in discovery including, taking the depositions of Goodyear executives and requesting production of documents. However, our holding in that case did not in any manner reduce the duty of the District Court to pass upon the admissibility and relevancy of information produced in the course of discovery.
Last we consider as a part of issue 1 the admissibility of the DeYoung videotape. On retrial this tape should not be played to the jury. It fails to show anything directly connected with the K-type wheel investigation or the accident which is the subject of this action. See Montana Rules of Evidence 402 and 403; 31 C.J.S. Evidence, § 108.
After a careful review of the extensive record including the transcript, we conclude that the District Court erred in admitting irrelevant and prejudicial evidence of the Goodyear political campaign contribution and all of the evidence relating to Watergate. In reaching that conclusion, we do not in any way condone the surreptitious contribution of $40,000 by Goodyear to the Committee to Re-elect the President. That was grossly improper conduct. Similarly, we do not in any way approve or condone Watergate, including the participants and their actions, which were so *56 graphically described to the jury. That is a national scandal of which none of us are proud. The key element is that plaintiff completely failed to connect the political contribution of Goodyear to the federal investigation of the multipiece wheels. The plaintiff failed to prove that the contribution was related in any manner to the multi-piece wheel, which exploded and caused the injury to the plaintiff. We agree with the District Court’s conclusion that this evidence was extremely damaging and obviously inflammatory in nature and should have been admitted only upon proof showing its relevance to the present action. The record discloses a total failure to establish such relevance. The possibility of prejudice is clearly present upon the examination of the very substantial punitive damages. We regret that counsel deemed it necessary to bring in this totally extraneous and prejudicial material. It prevented his seriously-injured client, as well as the defendant, from receiving a fair trial.
The second issue to be considered is whether the trial court erred in admitting irrelevant and prejudicial evidence of other accidents. This issue is subdivided into subparaqraphs. We will direct our attention to those sub-paragraphs covering material that should not be considered on retrial. In Runkle v. The Burlington Northern (Mont.1981), 613 P.2d 982, 37 St.Rep. 995, this Court set forth the test for determining the relevancy of “other accidents” evidence. The amissibility test for such evidence is to whether the circumstances surrounding the product involved in other accidents were substantially the same or similar to the accident at issue. This rule should be the guide for the trial court on retrial. A concerted effort should be made by that court to allow the admission of evidence of only those accidents where both the product and the circumstances surrounding the accident were similar to the case at bar. In a products liability case tried in the federal court, Rexrode v. American Laundry Press Co. (10th Cir.1982), 674 F.2d 826 at 829, the court held that substantial similarity is required in order to “prevent the jury from *57 being misled,” and the court further held that the party offering the “other accidents” bears the burden of showing such similarity.
With these rules, the trial court can on retrial carefully protect the record of admissions of the respondents here.
Issue No. 5 is directed to whether the court committed error in denying a new trial for the alleged misconduct of the bailiff. This issue is discussed principally because this case is being remanded for retrial. While the factsituation involved herein might not necessitate a reversal on this issue alone due to the fact that the defendant’s counsel learned of this misconduct while the jury was still out and failed to bring the matter immediately to the attention of the trial court, it is of such import that we urge the trial judge to instruct the bailiffsof the court to follow the statute as to theirduties and not communicate with the jurors during their discussions.
The petition for a new trial alleging the misconduct of the bailiff was made under MCA, 25-11-102, which provides:
“Grounds for new trial. The former verdict or other decision may be vacated and a new trial granted on the application of the party aggrieved for any of the following causes materially affecting substantial rights of such party:
“(1) irregularity in the proceedings of the court, jury, or adverse party or any order of the court or abuse of discretion by which either party was prevented from having a fair trial;”
Here the affidavit of counsel for the defendant Goodyear stated that, (1) the bailiff told the jurors not to “get hung up” on the instructions in deciding the case; and, (2) during the deliberations while several jurors were trying to apply the instructions, those jurors were reminded by another juror of what the bailiff had said about not “getting hung up” on the instructions; and, (3) the bailiff, upon being informed by a juror that there were “four hardnosed women in there you can’t get anything done with,” responded, “well, can’t you work around them?” and, (4) when a juror *58 gave the bailiff a written question about an instruction, the bailiff stated that the question was “self-explanatory.” Such conduct by a bailiff cannot be tolerated.
The appellant next argues the question of instructions given, and whether the court erred in submitting instructions 13, 27, and 41 to the jury, and that these instructions did not include “without substantial change and condition” as an essential element of the plaintiff’s proof.
This Court entered into the age of product liability in 1973 with its opinion in Brandenburger v. Toyota Motor Sales, U.S.A., 7nc.(1973), 162 Mont. 506, 513 P.2d 268. In that opinion, we adoptedsection 402A of the Restatement of Torts (2nd Ed.), as the applicable law in Montana for strict product liability cases.
That opinion was further developed in a case of this Court that came down five yers later, Brown v. North American Manufacturing Company (1978), 176 Mont. 98, 576 P.2d 711. Many of the arguments of defense counsel in this case were made in Brown. This is particularly true as to the argument of appellants that the danger was “open and obvious” and that the product was not “defective” or “unreasonably dangerous” if the danger, occasioned by the use, is open and obvious to the user.
As we noted in Brown, supra, the appellant advanced the “open and obvious danger,” or “patent-latent” rule as a bar to the plaintiff’s recovery under the theory of strict liability. There we rejected such rule noting also that it had been rejected by many other jurisdictions.
We held in Brown, that the “open and obvious danger” rule is not contained in 2 Restatement of Torts (2nd Ed.) Section 401A, nor in the comments thereto. The source of that rule was a New York case, Campo v. Scofield (1950), 301 N.Y. 468, 95 N.E. 2d 802. However, that rule was abandoned by the New York Court of Appeals in a later case, Micallef v. Miehle Co., Division of Miehle-Goss Dexter, Inc. (1976), 39 N.Y. 2d. 376, 384 N.Y.S.2d 115, 348 N.E.2d 571.
*59 In Brown, following the better reasoned cases, we held that such a rule would operate to encourage misdesign. The fact that it was a patent danger does not prevent a finding that the product is in a defective condition or unreasonably dangerous to the particular plaintiff. Rather, the obvious character of the defect or danger is but a factor to be considered in determining whether the plaintiff in fact assumed the risk. We held in Brown, supra, that, “a showing of proximate cause is a necessary predicate to plaintiff’s recovery in strict liability.” Strict liability is, of course, not “complete liability without fault.” There is no absolute immunity. Plaintiffs behavior may result in a break in the chain of causation and operate to bar recovery as described in 2 Restatement of Torts (2d Ed.), Section 402A, Comment (n).
We further hold that the above standard of conduct, set forth in Section 402A, comment (n), of plaintiff as related to the injury must be considered on the assumption of risk when applied to strict liability cases. We further hold that in considering assumption of risk in strict liability cases, the actions of the plaintiff are to be judged by applying a subjective standard to plaintiffs conduct rather than the objective standard of a reasonable man.
The evidence produced in this case, including the appellantGoodyear’s records and records from federal government investigation of the rim design, indicates that there were numerous accidents experienced over a considerable period of time involving the K-type rim. Testimony from both the Goodyear engineers and plaintiff’s experts, as well as Goodyear’s field surveys and their conclusions, indicates that the K-type rim was an inherently and unreasonably dangerous design, and that for some years Goodyear had knowledge of that fact. Part of the testimony of Goodyear’s expert, a field engineer, R.M. Smith, showed that the parts of the rim were inherently dangerous both on the highway and in the shop. When in use, the dangerous condition is often masked.” In this case, the appellant does not raise the *60 question of sufficiency of the evidence of design defect. There was no issue presented in the case of intervening alteration in th design of the product. Goodyear’s design engineer, Gerhart Gerbeth, testified that he could find no indication that anyone had changed Goodyear’s design of either the rim or the ring, either or both of which could have contributed to the explosion that injured the plaintiff.
Appellant Goodyear contends that instruction no. 13 is erroneous in omitting the language requiring that the “product reached Dennis Kuiper without substantial change in the condition in which it was sold.” However, appellant in this instruction did not submit the defective condition of the product, but rather that the product was defectively designed.
Appellant objects to instruction no. 13 which states:
“You are instructed that in order to recover on the allegation of design defect, the plaintiff must prove:
“First, that the defendant designed and manufactured the K-type rim base and ring which at the time of manufacture was defective in design and unreasonably dangerous to the user.
“Second, that at the time of the accident the K-type rim base and ring were being used by Kennis Kuiper in a manner reasonably anticipated by the defendant.
“Third, that the defective design in the K-type rim base and ring proximately caused injury to the plaintiff.”
Appellant argues that the instruction omits the requirement that the product be shown to be in substantially the same condition at the time of injury as it was at the time it left the manufacturer’s hands.
The correct law governing plaintiffs proof in a design case is found in Brown, 176 Mont, at 105, 106, 576 P.2d at 716, we stated:
“[1] In order to establish a prima facie case in strict liability based upon the above definition, a plaintiff must prove the following elements:
(1) the product was in a defective condition ‘unreasonably’ *61 dangerous to the user or consumer;
(2) The defect caused the accident and the injuries complained of; and
(3) The defect is traceable to the defendant.”
Court’s instruction no. 13 requires the jury to find that the product was defective in design at the time of manufacturing. This satisfies the three-prong test for a prima facie case in strict liability, which is the third element of the plaintiff’s case set forth in Brown, supra. We find that all of the elements of the design defect case are set forth in Brown and are incorporated in the instruction no. 13.
At this point we note that the respondent cites as authority in its brief, Kuiper v. District Court of the Eighth Judicial Dist., supra, for the proposition that said case sets forth the elements of strict liability for defective design and failure towarn. The respondent further bases much of his argument on a citation allegedly made in Kuiper to that effect. We note that the action in Kuiper was one of supervisory control directed to the discovery of certain documents and compelling answer thereto.
In rejecting Goodyear’s argument denying his motion for new trial, the trial court very carefully considered the objections to the above two instructions and set forth his reasons for denying the same. We concur in the trial judge’s holding and find no error. The trial judge noted in denying the motion for new trial that,
“There is no requirement that a design remain in substantially the same condition since obviously the design of the product does not change from the date of its original manufacture, absent some modification in design which was not an issue in this case.
“This issue is considered at length during the instruction conference between the court of counsel and it is the court’s concerted opinion that in a [product liability] design case, the changes in the product through wear, tear, or even abuse do not affect the question of whether the original de *62 sign was defective and unreasonably dangerous. Design is judged not by the condition of the product, but the state of scientific and technical knowledge available to the designer at the time the product was placed on the market.” Goodyear acknowledged this proposition in its offered instruction 27(a) which was court’s instruction no. 14.
“If the design was defective and that defect proximately caused the accident, any design changes and condition of the rim during the prior uses are irrelevant and would not preclude the plaintiff’s recovery for design defect. * * *”
The Court notes that Goodyear’s proposed instruction 25(a), given as court’s instruction no. 24, uses the word “anticipate” and resolves possible confusion or misdirection regarding substantial change by requiring a finding in favor of Goodyear. If the jury determined the product was not defective and unreasonably dangerous when it left Goodyear’s control, but was made dangerous by subsequent alteration, change, improper maintenance, abuse, or abnormal use, which the manufacturer could not reasonably anticipate, there would be no liability. These instructions were read together, and in light of the evidence of the case make it clear that Goodyear could not be heldliable for defects in the product occurring after it left Goodyear’s control, as opposed to design defect. Both instructions are correct of the law.
Obviously, the trial judge here instructed the jury to the effect of subsequent alteration or change, but they were cautioned that the law does not presume that the product was in defective condition at the time it left the hands of the manufacturer. Instruction no. 20, stated that the lapse of time from the date of the manufacture to the date of the accident, was a factor to be considered; instruction no. 22, that the manufacturer is not required to produce or sell a product that will never wear out; instruction no. 23, that in order to recover, the plaintiff had to prove that the rim base and ring were being used in a manner reasonably anticipated by Goodyear; instruction no. 13, that the jury *63 must find that the product was defective in design at the time of manufacturing in order for plaintiff to recover.
Not only were these instructions proper statements of the law in product liability in Montana, but they were properly given in this case. We find no error.
We have held in strict liability cases, such as Brandenburger, and Brown, that:
“On whatever theory, the justification for strict liability has been said to be that the seller, by marketing his product for the use and consumption, has undertaken and assumed a special responsibility toward any member of the consuming public who may be injured by it; that the public has a right and does expect, in a case of products which it needs and for which it is forced to rely on the seller, that reputable sellers will stand behind their goods; that the public policy demands that the burden of accidental injuries caused by products intended for consumption to be placed upon those who market them, and be treated as a cost of production against which liability insurance can be obtained; and that the consumer of such products is entitled to the maximum of protection at the hands of someone, and the proper persons to afford it are those who placed the product in the market.”
Restatement of Torts (2d Ed.), Section 402A, comment (c), p. 349, 550.
Recognizing that the seller is in the best position to insure product safety, the law of strict liability imposes on the seller a duty to prevent the release of “any product” in the defective condition unreasonably dangerous to the user or the consumer, “into the stream of commerce.” See Restatement of Torts (2d Ed.), Section 401(a)(65). This duty is unknown in the law of negligence and it is not fulfilled even if the seller takes all reasonable measures to make his product safe. The liability issue focuses on whether the product was defectiveand unreasonably dangerous, not only upon the conduct of the user or the seller. Put in this light,the only duty imposed on the user is to act *64 reasonably with respect to the product which he knows to be defective and dangerous. It is only when the user unreasonably proceeds to use a product which he knows to be defective and dangerous, that he violates this duty and relinquishes the law.
In summary, assumption of risk is an available defense in a strict liability case. The defense must establish that plaintiff voluntarily and unreasonably exposed himself to a known danger. If the defense is found to exist then plaintiff’s conduct must be compared with that of defendant. The same Montana law which governs comparison of contributory negligence controls comparison of assumption of risk.
The policies of negligence and warranty liability will best be served by keeping the spheres in which they operate separate until such time as the legislature indicates how and by what extent they are to be changed. The standards of care and the duties are well-defined in each sphere.
We have carefully examined the many issues raised on this appeal, and except to the issues here addressed, we find further discussion of the issues unnecessary. However, under the facts and circumstances herein recounted, it can only be said that the irrelevant political evidence affected this jury. It takes no fanciful flight to perceive the strong probability of prejudice to the defendant preparing to defend a product liability cause.
It is understandable for persons witnessing the enormity of the misconduct of the officials of Goodyear Tire & Rubber Company, in its efforts to re-elect Richard Nixon to hold their feet to the fire and make them pay for their misdeeds. That is not the problem this Court had to face in deciding this case.
The first Justice Harlen speaking for the court in the case of Vicksburg and Meridan Railroad Co. v. O’Brien (1886), 119 U.S. 99, 103, 7 S.Ct. 172, 174, 30 L.Ed. 299, 300, stated:
“While this court will not disturb a judgment for an error that did not operate to the substantial injury of the party *65 against whom it was committed, it is well settled that a reversal will be directed unless it appears beyond a doubt that the error complained of did not and could not have prejudiced the rights of the party.”
See also, Goff v. Kinzle (1966), 148 Mont. 61, 417 P.2d 105.
This cause is remanded for a new trial.
MR. CHIEF JUSTICE HASWELL and JUSTICE WEBER concur.