No. 89-024

IN THE SUPREME COURT OF THE STATE OF MONTANA

1989

---

ANDREW KRUEGER and SUZANNE KRUEGER,

  Plaintiffs and Respondents,

 -vs-

GENERAL MOTORS CORPORATION,
a Delaware Corporation,

  Defendant and Appellant.

---

APPEAL FROM: District Court of the Eighth Judicial District Court,
      In and for the County of Cascade,
      The Honorable Thomas M. McKittrick, Judge Presiding.

COUNSEL OF RECORD:

  For Appellant:

    Curtis G. Thompson; Jardine, Stephenson, Blewett & Weaver,
    Great Falls, Montana
    Richard A. Bowman, Argued, Kent B. Hanson and Kim M.
    Schmid; Bowman & Brooke, Minneapolis, Minnesota

  For Respondent:

    Dennis Patrick Conner, Argued, Great Falls, Montana
    Erik B. Thueson, Helena, Montana

Submitted: October 16, 1989

Decided:

Clerk

FILED

Filed: '89 DEC 18 PM 12 07

ED SMITH, CLERK
MONTANA SUPREME COURT

Justice R. C. McDonough delivered the Opinion of the Court.

This is an appeal from a jury verdict and judgment of the Eighth Judicial District, Cascade County, awarding general and special compensatory damages in a products liability case. Defendant General Motors Corporation [GM] appeals an award of the District Court of the Eighth Judicial District, Cascade County awarding the plaintiff Andrew Krueger (Krueger) damages in the sum of $1,293,430.00. The District Court found that GM's failure to warn regarding a defectively designed full-time four wheel drive transfer case was the proximate cause of plaintiff's injuries. We affirm.

GM raises the following issues and specifications of error on appeal:

1) Did the District Court err in excluding evidence of videotaped tests conducted by the defendant's expert witness regarding the response of various types of transfer cases under conditions similar to the accident in question?

2) Did the District Court err in admitting evidence of other incidents involving the sudden rolling of vehicles equipped with the New Process Model 203 transfer case?

3) Did the District Court err in excluding evidence of plaintiff's prior drug convictions and alleged habitual drug use on the issue of plaintiff's life expectancy?

4) Did the District Court err in instructing the jury regarding the affirmative defense of assumption of the risk in products liability litigation?

5) Is there substantial evidence in the record to support the District Court's finding that GM's failure to warn was a proximate cause of Andrew Krueger's injuries?

6) Did the District Court err in admitting into evidence hearsay testimony and allowing plaintiff's arguments alleged by defendant to be based on hearsay statements?

7) Did the District Court err in overruling defendants objections to plaintiff's closing arguments requesting the jury to "send a message" to GM when punitive damages were not an issue in the case?

On February 17, 1983 Krueger experienced problems with the universal joint on the front drive shaft of a 1976 General Motors Chevrolet full-time four wheel drive pickup that he had borrowed from a friend. He drove the pickup to the Pit Stop, an auto repair shop in Great Falls owned by a friend, where he planned to remove the shaft and leave it for repairs.

Krueger parked the truck on the sloping driveway outside the Pit Stop (approximately 5½°) and with the vehicle engaged in park proceeded to remove the front drive shaft. When Krueger disconnected the shaft the pickup began to roll down the slope of the driveway. The back of Krueger's head got caught in the front differential and was pulled forward on to his chest as the truck rolled over him. The accident broke Krueger's neck and severely damaged his spinal cord, rendering Krueger a quadriplegic.

Prior to 1973, all GM four wheel drive vehicles were equipped with conventional transfer cases; with such transfer cases the rear drive shaft remains locked when the vehicle is in "park." This is necessary because with a conventional transfer case disengaged and the wheel hubs unlocked, as they normally would be on dry pavement, the vehicle is essentially a two wheel drive vehicle and would roll unless the rear drive shaft was locked.

The pickup involved in this accident was equipped with a New Process Model 203 full-time four wheel drive transfer case, used in GM models with automatic transmissions from the years 1973 to 1979. On these vehicles, the "park" gear locks the power output shaft leading from the engine to the

transfer case, to which the front and rear drive shafts are then connected.

Because of cornering problems where the outer wheel must rotate faster than the wheels on the inside of the corner, a differential is needed to compensate for these two different rotation speeds. A differential makes this compensation by applying the engine's driving force through the path of least resistance. In a full-time four wheel drive vehicle, a third inter-axial differential, located in the transfer case, is needed to compensate for the difference in cornering speeds between the front and rear wheels. When either of the drive shafts is disconnected on a full-time four wheel drive, this inter-axial differential applies the locking force of the "park" gear through the path of least resistance to the drive shaft that is no longer connected, this allows all the vehicle's wheels, including those on the still connected axle and drive shaft, to roll freely. Thus, a vehicle equipped with a New Process Model 203 transfer case and engaged in "park" will begin to roll when a single drive shaft is removed or a single wheel is jacked off the ground. The only way to prevent this motion is to first engage the vehicle in "park" and then in four wheel drive "lock." Engaging "lock" on a full-time four wheel drive is similar to engaging the transfer case and locking the hubs on a conventional four wheel drive. It locks all wheels so they will turn at the same speed regardless of cornering distances, eliminating the function of the differential, and thus no one portion of the drive train can become a path of least resistance.

As one can see, there is a great difference in the effect of putting a full-time versus a conventional four wheel drive pickup in park when the front drive shaft is disconnected. In the conventional models, "park" locked the rear drive shaft and that is all that had to be done. But in

a vehicle equipped with the New Process Model 203 one had to place the transmission in "park" and also engage the transfer case in "lock," locking all four wheels and insuring that the vehicle was completely immobilized.

During his service in the military, Krueger gained considerable experience and knowledge regarding the operation and repair of conventional four wheel drive vehicles. Krueger had also been employed as a drive line specialist for Glacier Motors in Cut Bank, Montana. During that time he built and repaired approximately 500 drive lines. Krueger's knowledge or lack thereof of the dangers in removing the front drive shaft on a full-time four wheel drive equipped with the New Process Model 203 and whether GM provided a reasonably safe transfer case design and/or a warning suffi-cient to avoid strict products liability were focal issues at trial.

During trial, plaintiff advocated an alternative trans-fer case design, the Borg Warner Quadra Trac (used in Jeeps at the time), asserting that it would have prevented the accident. The Quadra Trac employs a limited-slip friction clutch in the transfer case to retain the traction that would be lost when all the power is transferred via the differential to the wheel experiencing the least resistance. The friction clutch requires an individual wheel or axle to experience a threshold amount of torque for the clutch to slip and allow the differential to work freely. Until the threshold level of torque is reached, such as when the inside wheel experiences resistance when cornering, both wheels will revolve at the same speed. Thus, when a single wheel is the only one powered, such as when one wheel spins out on ice or snow, the friction clutch provides a limited traction recovery to the other wheel until the spinning wheel regains its traction. A vehicle equipped with the New Process 203,

5

on the other hand, would be unable to generate any traction and remain immobile. Friction clutches wear out quickly and are rarely maintained at the torque specifications level present when manufactured.

Krueger argued that a properly maintained Borg Warner Quadra Trac transfer case would have prevented the accident because the friction clutch in the transfer case differential would have engaged the park gear to the rear drive shaft once the vehicle began to roll. Plaintiff contended that this would have either held the vehicle on the slope or, if the clutch was worn, slowed its rolling enough to provide Krueger enough time to get clear of the vehicle. GM argued that even a Borg Warner Quadra Trac transfer case at specifications would not have held the vehicle on the accident slope.

## I.

We now address the first issue raised by GM: Did the District Court err in excluding evidence of videotaped tests conducted by the defendant's expert witness regarding the response of various types of transfer cases under conditions similar to the accident in question? In its brief, GM argues that copies of the videotapes were given to the plaintiff prior to trial, and thus do not raise a discovery compliance issue. At the deposition of defendant's expert, Richard Keefer, approximately two weeks prior to trial, GM assured Krueger's attorney, Mr. Dennis Conner, that any such videotapes would be disclosed prior to trial:

> Q    (BY MR. CONNER)    Well, what pending assignments do you have?
> A    Pending assignments?
> Q    Right.
> A    I don't believe I have any specific pending assignments. . . . if refinements to the preliminary work we've done on evaluating various kinds of vehicles, full-time and/or part time and

6

the rollaway situation, are requested, why, I expect we'll do it. And if it's requested that they are reported in some way, why, we certainly have the capability to do that.

MR. CONNER: Well, if he's going to do any further work prior to the time of trial, I'd like such documents or records that are generated which are discoverable to be certainly produced prior to trial, as well as having the opportunity to further depose him---

MR. HANSON: Well, if you're agreeing, then---

MR. CONNER: ---on that subject.

MR. HANSON: ---when you have your witnesses do all the work they haven't yet done that you're going to reproduce them for depositions, fine. Tamny hadn't done jack squat when he got under oath. And we're not going to agree to any kind of conditions on our people, redeposing them, that isn't going to apply to you, certainly.

We will certainly show you whatever exhibits are generated, and we will inform you of anything you're entitled to know about the basis or grounds for his opinions. Whether I'm going to bring Mr. Keefer back and have you depose him again, I highly doubt it, just as I highly doubt that you're going to give me a meaningful opportunity to learn what Tamny's done since the time of his deposition.

Keefer Depositon, pp. 123-125. (Emphasis added.) Mr. Keefer was deposed on July 12, 1988. Prior to the deposition he conducted tests of various four wheel drive vehicles to determine if they would roll on a slope equal to the accident slope when the driveline was removed. During these tests he determined that a 1977 Jeep equipped with a Borg Warner Quadra Trac transfer case would not roll on the test slope. Keefer Deposition, p. 139. On July 21 and 22 he conducted further tests, recording them on videotape. GM alleges that this new evidence would demonstrate that virtually any vehicle, including a Jeep with Quadra Trac, would respond as the accident vehicle did under the circumstances. The trial began on July 25, 1988, three days after the final testing.

7

The existence and content of the videotapes was not disclosed to plaintiff until mid-trial, after the plaintiff had rested on August 3, 1988.

In this regard, the facts of this case are similar to those in Workman v. McIntyre (1980), 190 Mont. 5, 617 P.2d 1281, where we held that admission of an undisclosed film exhibit was an abuse of discretion. The film was not made available to the plaintiff after assurances by the State that it would be. We held that:

> These tactics are contrary to the letter and spirit of all pretrial discovery which is to prevent surprise, to simplify the issues, and to permit counsel to prepare their case for trial on the basis of the pretrial order.

Workman, 617 P.2d at 1285. It is clear from the record in this case that GM assured the plaintiff that any further exhibits generated by their expert would be disclosed prior to trial and that GM failed to do so. The District Court did not abuse its discretion in excluding the videotape evidence.

GM's expert was also precluded from testifying regarding the tests conducted in the excluded videotapes, and regarding current model full-time four wheel drive designs. The trial judge ruled that:

> Well that's part of the experiment and that's subsequent to the close of discovery. And its also a possibility of interjecting subsequent designs. So our court is clear on that that those are not permissible.

Transcript, August 8, 1988, p. 1996.

We agree. In a strict liability action under a design defect theory, the question is whether the design specifications were partly or totally defective. Rix v. General Motors Corp (1986), 222 Mont. 318, 330, 723 P.2d 195, 202. Design specifications are "judged not by the condition of the

product, but the state of scientific and technological knowledge available to the designer at the time the product was placed on the market." Kuiper v. Goodyear Tire & Rubber Co. (1983), 207 Mont. 37, 62, 673 P.2d 1208, 1221. (Emphasis added.) In Rix, we set forth the following elements for instructional purposes in an alternative design products liability case:

> . . . (3) In determining whether an alternative design should have been used, the jury should balance so many of the following factors as it finds to be pertinent at the time of manufacture:
> (a) The reasonable probability that the product as originally designed would cause serious harm to the claimant.
> (b) Consideration of the reasonable probability of harm from the use of the original product as compared to the reasonable probability of harm from the use of the product with the alternative design.
> (c) The technological feasibility of an alternative design that would have prevented claimant's harm.

Rix, 723 P.2d at 201. (Emphasis added.) Thus, the only test evidence admissible in this case would be test evidence concerning other designs available at the time the New Process 203 transfer case was placed on the market, such as the Borg Warner Quadra Trac, or conventional transfer cases. The record indicates that all the evidence excluded by the District Court was either associated with the inadmissible videotape tests, or involved subsequent designs used in the automobile industry, particularly the designs used in current model full-time four wheel drive passenger vehicles. We reiterate the rule as we did in Rix:

> . . . a design is defective if at the time of manufacture an alternative designed product would have been safer than the original designed product and was both technologically feasible and a

> marketable reality.  <u>Again</u> <u>the</u> <u>time</u> <u>frame</u> <u>under</u> <u>scrutiny</u> <u>is</u> <u>the</u> <u>time</u> <u>of</u> <u>manufacture</u> <u>and</u> <u>not</u> <u>any</u> <u>other</u> <u>time</u>.

<u>Rix</u>, 723 P.2d at 202.  (Emphasis added.)  The District Court did not abuse its discretion in excluding evidence concerning the late test results and evidence of designs not pertinent to the time of manufacture.

## II.

Regarding the second issue raised by GM, the test of admissibility for evidence of other accidents in a products liability case is "whether the circumstances surrounding the product involved in other accidents were substantially the same or similar to the accident at issue."  <u>Kuiper</u>, 673 P.2d at 1219.  The accidents need not be identical to be admissible.  Runkle v. Burlington Northern (1980), 188 Mont. 286, 292, 613 P.2d 982, 986.

Here, the other accidents all involved the New Process Model 203 transfer case and its inherent design characteristics which cause it to roll when a single wheel is jacked up or a single drive shaft removed.  Although one incident involved a Chrysler vehicle, that vehicle was equipped with the same 203 transfer case used by GM.  Also, the incident involving removal of the rear drive shaft demonstrates the same roll-away characteristics at issue in this case that distinguish the New Process 203 from a conventional transfer case or one equipped with a limited slip differential.

The admission of evidence of other accidents in products liability litigation is entrusted to the discretion of the trial judge.  Tacke v. Vermeer Mfg. Co. (1986), 220 Mont. 1, 9, 713 P.2d 527, 532.  We do not see any abuse of discretion in this case.

10

III.

As its third issue GM argues that the District Court erred in excluding evidence of Krueger's alleged habitual drug use on the issues of plaintiff's life expectancy and assumption of the risk. Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Rule 403, M.R.Evid. Here, the evidence is speculative at best, and, if it bears any relevance at all to this case, the evidence is of such a highly prejudicial nature in comparison to its probative value that its admission could constitute error.

Under Rule 403, the determination of admissibility is within the discretion of the trial judge and will not be disturbed unless there is manifest abuse of discretion. Zeke's Distributing Co. v. Brown-Forman Corp. (Mont. 1989), 779 P.2d 908, 911, 46 St.Rep. 1678, 1681; Dahlin v. Holmquist (1988), 766 P.2d 239, 241, 45 St.Rep. 2127, 2129-2130. The exclusion of the drug evidence in this case was a sound exercise of discretion by the trial judge.

IV.

Pertaining to issue IV, at trial, the District Court gave the following instruction, in addition to the pattern instruction (Instruction No. 23), on the affirmative defense of assumption of the risk:

> The Defendant has the burden of proving that Andy Krueger assumed the risk of his injuries. To establish this defense, General Motors must prove:
>
> (1) That Andy Krueger actually knew before he was injured that the vehicle would roll if he disconnected the front driveline;
>
> (2) That knowing this, Krueger voluntarily exposed himself to the danger, and

11

(3)   That Krueger unreasonably exposed himself to that danger.

If the Defendant fails to prove all three of the above, then Andy Krueger did not assume the risk of his injuries.

Instruction No. 20.   GM argues that the instruction erroneously requires that Krueger knew the truck would roll on him and render him a quadriplegic before he attempted to disconnect the front driveline, the absurd equivalent of requiring that he have a death wish.

With regard to the affirmative defense of assumption of the risk in products liability, Montana has adopted the position of the Restatement of Torts 2d, § 402A, Comment (n):

> Contributory negligence of the plaintiff is not a defense when such negligence consists merely in a failure to discover the  defect in the product, or to guard against the possibility of its existence.   On the other hand the form of contributory negligence which consists in voluntarily and unreasonably proceeding to encounter a known danger, and commonly passes under the name of assumption of risk, is a defense under this Section as in other cases of strict liability.   If the user or consumer discovers the defect and is aware of the danger, and nevertheless proceeds unreasonably to make use of the product and is injured by it, he is barred from recovery.

Brown v. North Am. Mfg. Co. (1977), 176 Mont. 98, 110, 576 P.2d 711, 719.   Assumption of the risk is now apportioned in a manner similar to fault under a  comparative negligence scheme.   Zahrte v. Sturm, Ruger & Co., Inc. (1983), 203 Mont. 90, 94, 661 P.2d 17, 19.

The standard applied in evaluating the defense is a subjective one rather than the objective standard of the reasonable man test:

12

> "The standard to be applied is a subjective one, of what the particular plaintiff sees, knows, understands and appreciates. In this it differs from the objective standard which is applied to contributory negligence. . . . If by reason of age, or lack of information, experience, intelligence, or judgment, the plaintiff does not understand the risk involved in a known situation, he will not be taken to assume the risk, although it may be found that his conduct is contributory negligence because it does not conform to the community standard of the reasonable man."

Brown, 576 P.2d at 719, quoting Restatement of Torts 2d, § 496D, Comment (c). In order for GM to assert the defense, Krueger must have had subjective or actual knowledge that the truck would roll. This does not require that he have knowledge of the severity of the injuries he would suffer. GM admitted that Krueger would have never attempted to complete the repairs in the manner he chose if he knew that the vehicle would begin to roll when he disconnected the drive shaft.

GM asserts that Instruction 20 is tantamount to an abolition of the defense of assumption of the risk in products liability. We disagree. The instruction merely required that the plaintiff have actual knowledge of the danger and then specifically stated what actual knowledge of the danger entails under the facts of this case. It was obvious to the jury under these facts that Krueger lacked such knowledge. In other cases it may be equally obvious that a plaintiff has subjective knowledge of the actual danger posed by a defect. In such cases, a jury could then evaluate the extent to which that plaintiff assumed the risk of his injuries.

It is reversible error to refuse to instruct on an important part of a party's theory of the case. Furthermore, a party has a right to have jury instructions which

13

are adaptable to his theory of the case. Tacke, 713 P.2d at 534. Although we believe that Montana Pattern Instruction 7.05, taken directly from Zahrte, would have been a sufficient, comprehendable and accurate statement of the law in this case, we find no error on the part of the trial judge in giving Instruction No. 20 as a complementary instruction under the facts of this case.

V.

We now turn to the issue of sufficiency of the evidence, (Issue V), to support the District Court's denial of GM's motions for directed verdict and new trial.

When reviewing a jury verdict, this Court's function is to determine if there is substantial credible evidence in the record supporting the jury's verdict. Gunning v. General Motors Corp. (Mont. 1989), 779 P.2d 64, 66, 46 St.Rep. 1546, 1548, Weinberg v. Farmers State Bank of Worden (1988), 752 P.2d 719, 721-722, 45 St.Rep. 391, 392. Where there is substantial evidence to support the jury's verdict the District Court's refusal to grant a new trial will not be disturbed. Brothers v. Town of Virginia City (1976), 171 Mont. 352, 358, 558 P.2d 464, 467. When reviewing a denial of a motion for directed verdict, we concede as true all of plaintiff's evidence and give the plaintiff the benefit of all legitimate inferences. If the record at that point should contain substantial evidence sustaining the jury finding then the trial court's action in denying the motion for directed verdict and submitting the cause to the jury, and the jury verdict itself, must be sustained. Brothers, 558 P.2d at 467.

In the case at bar there is substantial credible evidence supporting the jury's verdict and the District Court's denial of GM's motions for directed verdict and new trial. This evidence supports the finding that GM's failure to warn

14

concerning the inherent design characteristics of the New Process Model 203 transfer case---characteristics causing vehicles equipped with it to roll under circumstances that vehicles equipped with conventional transfer cases would not---was the proximate cause of Krueger's injuries. Krueger's testimony and the testimony of the other accident victims tended to prove the same thing: the accident victims all believed that a vehicle equipped with the New Process Model 203 transfer case would behave like a conventional four wheel drive when a driveline was removed or a wheel jacked up; they all testified that had they known otherwise they would never have attempted the repairs in the manner they did. Furthermore, evidence was presented regarding the Borg Warner Quadra Trac transfer case that enabled the jury to balance the transfer case design chosen by GM against the feasibility and marketability of alternative designs.

A manufacturer may be required to provide a warning in relation to its product if it is to avoid a determination that the product is unreasonably dangerous. Restatement of Torts 2d § 402A, Comment (j) at 353 (1965). The product is automatically defective if it is unreasonably dangerous, and a warning is required but not given. Rost v. C. F. & I. Steel Corp. (1980), 189 Mont. 485, 488, 616 P.2d 383, 385. It is the manufacturer's duty to warn inadequately informed users about the risk of danger involved with the use of a product. Streich v. Hilton-Davis (1984), 214 Mont. 44, 54, 692 P.2d 440, 445.

The only alleged warning given by GM is contained in a sticker that was located on the driver's sunvisor in the accident vehicle and all vehicles equipped with the New Process 203 transfer case. Plaintiff's Exhibit 199. This sticker merely consists of operating instructions for full-time four wheel drive in the unlocked and locked positions of

15

the transfer case, it does not warn of any of the dangers or differences from conventional transfer cases when repairs are attempted with the transfer case and interaxial differential unlocked.

GM contends that because of Krueger's training in motor vehicle repair and the precautions associated with it, (such as using the parking brake, wheel chocks, and generally avoiding repairs on a slope), it is clear that any warning given "would have fallen on deaf ears." Rost, 616 P.2d at 386-387. In this regard, GM argues that the jury was entitled to hear evidence regarding plaintiff's propensity toward carelessness in the face of information available to him, including evidence of plaintiff's alleged use of dangerous drugs.

We have already discussed the admissibility of the alleged drug evidence and do not believe the subject merits further discussion. Furthermore, the "deaf ears" situation in Rost is distinguishable from the case at bar. In Rost, a warning by the manufacturer of elevator cables was excused because the owner of the premises where the plaintiff was injured had a duty to maintain and inspect the elevator and would have failed to do so regardless of a warning of the obvious fact that worn elevator cables pose a serious danger. In fact, the store owner in Rost had been involved in a prior accident in the same elevator when the cables broke. Here, there is no superseding cause excusing GM's failure to warn. Thus, the jury was entitled to find that GM's failure to warn was the proximate cause of Krueger's injuries.

## VI.

We now come to issue VI concerning the admission of hearsay statements and arguments based on such statements. GM objects to the admission of the hearsay testimony of an alleged GM master technician as given by Krueger's expert

16

Simon Tamny. Mr. Tamny testified regarding a conversation that he had with the technician about a similar accident the technician had involving a 203 transfer case.

An expert may base an opinion on facts or data perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in a particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible into evidence. Rule 703, M.R.Evid. See e.g. Azure v. City of Billings (1979), 182 Mont. 234, 255, 596 P.2d 460, 472, State v. Deshner (1971), 158 Mont. 188, 193-194, 489 P.2d 1290, 1293-1294. At trial, plaintiff qualified Mr. Tamny as an expert in transfer case design. Field investigations of user experience is an appropriate method for such an expert to form opinions as to whether a particular transfer case design is an effective design or is dangerous. Mr Tamny synthesized the technician's accident with other incidents involving the New Process 203 in arriving at his opinion that the transfer case was defective and a warning should have been provided. See Azure, 596 P.2d at 472. The District Court did not abuse its discretion in allowing plaintiff's expert to testify concerning one of the bases upon which he formed his opinion.

GM's expert Paul Johnson testified that the torque specifications of the limited slip differential in the alternative design transfer case advocated by Krueger were not sufficient to hold the vehicle in place on the accident slope. During cross examination of the witness, Krueger's counsel referred to a hypothetical phone call where a Borg Warner employee had confirmed that the specifications were indeed the ones given in the testimony of Krueger's expert, and thus would have immobilized the accident vehicle or at least sufficiently slowed its rolling to allow the plaintiff to get clear of the vehicle. Krueger's counsel challenged

17

GM's expert to call Borg Warner during a recess and confirm the torque specifications of the alternative transfer case design.

The District Court sustained GM's initial objection to this questioning, then allowed Krueger's counsel to inquire after the recess whether Mr. Johnson had made the phone call. At closing argument, Krueger's counsel commented on Mr. Johnson's failure to accept counsel's challenge to call Borg Warner regarding the specifications.

The situation here is similar to that in Gunnels v. Hoyt (Mont. 1981), 633 P.2d 1187, 38 St.Rep. 1492, where we held that the plaintiff was not prejudiced by several instances of alleged misconduct by defense counsel, the most serious being that defense counsel made improper comments upon and references to excluded evidence, which indicated to the jury that the plaintiff was concealing evidence. Improper argument requires a reversal of a verdict only when prejudice has resulted which prevents a fair trial. Gunnels, 633 P.2d at 1194; Nelson v. Hartman (1982), 199 Mont. 295, 301, 648 P.2d 1176, 1179. Any prejudice suffered by the defendant here was minimal, and certainly did not rise to such level as to deprive GM of a fair trial.

## VII.

Finally, GM contends that the District Court erred in overruling GM's objections to Krueger's closing argument requesting the jury to "send a message to GM" when punitive damages were not an issue.

We decline in this case to determine whether the "send a message" argument is proper or prejudicial in products liability litigation where punitive damages are not an issue. As we stated earlier, improper argument requires reversal of a verdict only when prejudice has resulted that prevents a fair trial. Gunnels, supra, 633 P.2d at 1194; Nelson, supra,

18

648 P.2d at 1179. Considering the severity and permanent nature of plaintiff's injuries, and the daily attendant care he will require for the remainder of his life, we see the amount of the the jury's verdict as compensation for the plaintiff's injuries and not merely a reflection of alleged inflammatory remarks made during the plaintiff's closing arguments.

We conclude that there was no abuse of discretion by the District Court in denying General Motor's motions for directed verdict and new trial.

AFFIRMED.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____

_____
Justices