No.  96-161

IN THE SUPREME COURT OF THE STATE OF MONTANA

1997


MARLENE L. STERNHAGEN, as the Personal
Representative of the Estate of Charles J. Sternhagen
Plaintiff and Respondent,
vs.

DOW COMPANY, CHEVRON CHEMICAL
COMPANY, MONSANTO COMPANY,
STAUFFER CHEMICAL COMPANY and
JOHN DOE COMPANIES 1 through 4,
Defendants and Appellants.


CERTIFIED QUESTION  FROM:United States District Court
District of Montana, Great Falls Division
The Honorable Paul G. Hatfield, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Robert M. Carlson, Corette, Pohlman, Black, Carlson, Mickelson &
Johnston, Butte, Montana; Laurence F. Janssen, Lane, Powell, Spears,
Lubersky, Los Angeles, California (Dow Chemical Company); Christopher
Mangen, Jr.,Crowley, Haughey, Hanson, Toole & Dietrich, Billings,
Montana (Chevron Chemical Company and Stauffer Chemical Company)

For Respondent:

William A. Rossbach, Elizabeth A. Brennan, Rossbach & Whiston,
Missoula,          Montana

For Amicus Curiae Montana Trial Lawyers Association:

Lawrence A. Anderson, Great Falls, Montana



Heard and Submitted: January 28, 1997
Decided: April 10, 1997
Filed:


_____
Clerk
Justice James C. Nelson delivered the Opinion of the Court.

The United States District Court for the District of Montana, Great Falls Division,
has certified to this Court the following question:
In a strict products liability case for injuries caused by an inherently
unsafe product, is the manufacturer conclusively presumed to know the
dangers inherent in his product, or is state-of-the-art evidence admissible to

establish whether the manufacturer knew or through the exercise of reasonable human foresight should have known of the danger?

We conclude that Montana law precludes the admission of state-of-the-art evidence in products liability cases brought under the theory of strict liability.

## FACTUAL AND PROCEDURAL BACKGROUND

The United States District Court for the District of Montana, Great Falls Division, found the following facts relevant to the question of law certified to this Court:

1. In her complaint filed in the United States District Court for the District of Montana, plaintiff Marlene L. Sternhagen, as the personal representative of the estate of Charles J. Sternhagen, seeks recovery for injuries and damages allegedly sustained by Charles Sternhagen as a result of his exposure to the herbicide 2,4-D during the years 1948 through 1950. Plaintiff claims that the exposure of Charles Sternhagen to 2,4-D was the cause of the cancer that resulted in his death.

2. Plaintiff seeks recovery against the defendants under the doctrine of strict liability in tort. Plaintiff claims that each of the defendants separately manufactured the 2,4-D products to which Charles Sternhagen was exposed during the years 1948 through 1950.

3. During the summer months of 1948, 1949 and 1950, Charles Sternhagen was employed by a crop spraying business in northeast Montana. Plaintiff claims that during that time, Charles Sternhagen was exposed to the herbicide, 2,4-D.

4. In 1981, Charles Sternhagen, a medical doctor specializing in radiology, was diagnosed as having a form of cancer which plaintiff claims was caused by his exposure to the herbicide 2,4-D during the years 1948 through 1950. Defendants dispute the claim that there is a causal link between the herbicide 2,4-D and the type of cancer from which Charles Sternhagen died.

5. The defendants claim neither they, nor medical science, knew or had reason to know of any alleged cancer-causing properties of the herbicide 2,4-D during the years 1948 through 1950.

## DISCUSSION

Before addressing the question certified to us by the United States District Court, we will dispose of an issue injected into these proceedings by the Defendants/Appellants, Dow Company et al. (the Chemical Companies). The Chemical Companies first argue that negligence law, not strict liability, applies to this case. Plaintiff/Respondent, Marlene L. Sternhagen (Sternhagen), responds that this Court should not address this issue because it goes beyond the scope of the certified question. We agree.

We accepted the certified question as one involving only the doctrine of strict liability. The certified question does not ask this Court to determine whether negligence or strict liability law applies. To address this additional issue would go beyond the scope of the certified question and effectively render our decision an impermissible advisory opinion. See State ex rel. Fletcher v. Dist. Court (1993), 260 Mont. 410, 419, 859 P.2d 992, 997.

Our judicial power may be validly exercised only over justiciable controversies. Hardy v. Krutzfeldt (1983), 206 Mont. 521, 525-26, 672 P.2d 274, 276 (citing Chovanak v. Matthews (1948), 120 Mont. 520, 525-26, 188 P.2d 582, 584-85). A justiciable controversy contains three elements:

First, a justiciable controversy requires that parties have existing and genuine, as distinguished from theoretical, rights or interest. Second, the controversy must be one upon which the judgment of the court may effectively operate, as distinguished from a debate or argument invoking a purely political, administrative, philosophical or academic conclusion. Third, [it] must be a controversy the judicial determination of which will have the effect of a final judgment in law or decree in equity upon the rights, status or legal relationships of one or more of the real parties in interest, or lacking these qualities be of such overriding public moment as to constitute the legal equivalent of all of them.

Brisendine v. State, Dept. of Commerce (1992), 253 Mont. 361, 364, 833 P.2d 1019, 1020-21 (alteration in original) (quoting Lee v. State (1981), 195 Mont. 1, 6, 635 P.2d

1282, 1284-85).

In the case at bar, the federal District Court has not asked us to determine whether negligence or strict liability law applies, and, therefore, the second and third requirements necessary to establish a justiciable controversy are not satisfied.  That is,  for us to address this issue, we would be engaging in a debate  "invoking a purely . . . academic conclusion."  Furthermore, our opinion concerning this additional issue will not have the effect of a final judgment.  Additionally, we do not consider this issue to be "of such overriding public moment as to constitute the legal equivalent" of the second and third requirements of the test.  Consequently, if we were to address this issue, we would impermissibly render an advisory opinion.  Finally, having not been requested to do so, to address this additional issue would impose upon our comity relationship with the federal District Court in the pending case.  See Phillips v. Duro-Last Roofing, Inc. (Wyo. 1991), 806 P.2d 834, 837.  Accordingly, we will not address this issue.

The Chemical Companies next argue that if  Restatement (Second) of Torts  402A (1965), is the applicable  law, then state-of-the-art evidence is admissible because Montana law recognizes the state-of-the-art defense in failure to warn claims.  The Chemical Companies contend that the certified question must be read in conjunction not only with  Restatement (Second) of Torts  402A (1965), adopted by this Court in Brandenburger v. Toyota Motor Sales, U.S.A., Inc. (1973), 162 Mont. 506, 513 P.2d 268, but also with the comments to  402A, including Comment j.  Specifically, the Chemical Companies argue that the third sentence of Comment j applies, namely that "the seller is required to give warning . . ., if he has knowledge, or by the application of reasonably, developed human skill and foresight should have knowledge, of the presence of the . . . danger."  The Chemical Companies assert that we have cited with approval decisions of other courts that have adopted Comment j.  Additionally, the Chemical Companies cite to various strict liability cases wherein we have referenced certain portions of Comment j.  See e.g. Brown v. North Am. Mfg. Co. (1978), 176 Mont. 98, 576 P.2d 711 (Shea, J., concurring); Rost v. C.F. & I. Steel Corp. (1980), 189 Mont. 485, 616 P.2d 383; Krueger v. General Motors Corp. (1989), 240 Mont. 266, 783 P.2d 1340; and Emery v. Federated Foods, Inc. (1993), 262 Mont. 83, 863 P.2d 426.  Based on these references, the Chemical Companies claim that we essentially have adopted some of the language contained in Comment j.

The Chemical Companies concede that we limited the extent to which we adopted Comment j in Riley v. American Honda Motor Co. (1993), 259 Mont. 128, 134-35, 856 P.2d 196, 200.  However, the Chemical Companies assert that in Riley we only rejected that portion of Comment j regarding presumption of causation which they contend is irrelevant to the certified question before us.  Therefore, the Chemical Companies conclude that because this Court has not expressly rejected the third sentence of Comment j, we recognize the state-of-the-art defense.

Furthermore, the Chemical Companies contend that in Tacke v. Vermeer Mfg. Co. (1986), 220 Mont. 1, 713 P.2d 527, the plaintiff offered state-of-the-art evidence on the issue of the feasibility in a design defect case.  The Chemical Companies assert that if a plaintiff is allowed to offer state-of-the-art evidence to prove feasibility in a design defect case, a defendant may also offer state-of-the-art evidence to rebut feasibility as part of its defense.  Therefore, the Chemical Companies argue a defendant should also be allowed to offer state-of-the-art evidence to disprove the feasibility of a warning in a failure to warn case.

Sternhagen responds that the certified question must be answered based on the fundamental principles underlying strict products liability in Montana.  Sternhagen asserts that when this Court, in Brandenburger, adopted strict liability in tort for defective products as defined in Restatement (Second) of Torts  402A (1965), it did so based on substantial public interest and public policy grounds which included principles of fairness and economics, maximum protection for the consumer and placement of responsibility for injury on the manufacturer.  Sternhagen asserts that over the past two-plus decades, this Court has consistently returned to and relied upon these core principles.

Furthermore, Sternhagen contends that this Court has never adopted the state-of-the-art defense, but rather this Court has made it clear that even careful manufacturers may be strictly liable for unreasonably dangerous products which contained unforeseeable

dangers. Therefore, Sternhagen argues that the critical question for this Court is "whether imposition of liability for undiscovered or even undiscoverable dangers of inherently unsafe products will advance the goals and policies sought to be achieved by Montana's adoption of strict liability." In answering the certified question, Sternhagen urges this Court to again return to the core principles underlying the doctrine of strict liability and thereby reject the state-of-the-art defense.

We agree with Sternhagen that we have not previously adopted the state-of-the-art defense. Further, we expressly reject the state-of-the-art defense, as this defense is contrary to the doctrine of strict products liability as that body of law has developed in Montana. In reaching these conclusions, we emphasize that despite the Chemical Companies' assertion that the certified question involves a failure to warn cause of action, we note that the certified question is not so limited. Consequently, we address the certified question by addressing strict products liability law in Montana generally and without differentiating as among manufacturing defect, design defect, or failure to warn cases.

We first recognized the doctrine of strict liability by adopting the language set forth in Restatement (Second) of Torts 402A (1965) in Brandenburger. However, "[o]ur adoption of [ 402A], was not a wholesale adoption of the comments accompanying that provision; nor are we constrained by the comments in developing a body of products liability law." Riley, 856 P.2d at 200 (citing Stenberg v. Beatrice Foods Co. (1978), 176 Mont. 123, 128-29, 576 P.2d 725, 729). The Chemical Companies assert that we have either previously adopted or should now adopt the language of Comment j to 402A. However, after researching Montana law on strict products liability, we conclude that the language in Comment j, which the Chemical Companies contend supports the state-of-the-art defense, is inconsistent with our established law concerning strict products liability and we therefore decline to adopt that language. Rather, we conclude that the imputation of knowledge doctrine, as discussed below, is more consistent with existing Montana law.

Furthermore, the Chemical Companies rely on only one part of the third sentence of Comment j which, when considered in its entirety, indicates that this sentence is not applicable to the question certified to this Court. The Chemical Companies rely on the language, "the seller is required to give warning . . ., if he has knowledge, or by the application of reasonably, developed human skill and foresight should have knowledge, of the presence of the . . . danger." However, the third sentence of Comment j, from which that language is extracted, states:

Where, however, the product contains an ingredient to which a substantial number of the population are allergic, and the ingredient is one whose danger is not generally known, or if known is one which the consumer would reasonably not expect to find in the product, the seller is required to give warning against it [the ingredient to which people are allergic], if he has knowledge, or by the application of reasonable, developed human skill and foresight should have knowledge, of the presence of the ingredient [to which people are allergic] and the danger. [Emphasis added.]

The certified question before us involves an alleged cancer-causing ingredient, not one to which the decedent is alleged to have been allergic. Therefore, the third sentence of Comment j is not applicable to the certified question.

We adopted strict liability in torts for defective products based on important public policy considerations, to which we have consistently adhered for the past two-plus decades. "[T]he doctrine of strict liability was evolved to place liability on the party primarily responsible for the injury occurring, that is, the manufacturer of the defective product." Brandenburger, 513 P.2d at 273 (quoting Leakage, Inc. v. Montgomery (Ariz.1970), 467 P.2d 256, 261 (Jacobson, J., concurring)). We, thereafter enumerated various public policy considerations supporting adoption of the strict liability doctrine:

1. The manufacturer can anticipate some hazards and guard against their recurrence, which the consumer cannot do.

2. The cost of injury may be overwhelming to the person injured while the risk of injury can be insured by the manufacturer and be

distributed among the public as a cost of doing business.

3.    It is in the public interest to discourage the marketing of defective products.

4.    It is in the public interest to place responsibility for injury upon the manufacturer who was responsible for [the defective product] reaching the market.

5.    That this responsibility should also be placed upon the retailer and wholesaler of the defective product in order that they may act as the conduit through which liability may flow to reach the manufacturer, where ultimate responsibility lies.

6.    That because of the complexity of present day manufacturing processes and their secretiveness, the ability to prove negligent conduct by the injured plaintiff is almost impossible.

7.    That the consumer does not have the ability to investigate for himself the soundness of the product.

8.    That this consumer's vigilance has been lulled by advertising, marketing devices and trademarks.

Brandenburger, 513 P.2d at 273 (citations omitted).  Furthermore, we stated:
The essential rationale for imposing the doctrine of strict liability in tort is that such imposition affords the consuming public the maximum protection from dangerous defects in manufactured products by requiring the manufacturer to bear the burden of injuries and losses enhanced by such defects in its products.

Brandenburger, 513 P.2d at 275.
Subsequent to our adoption of strict liability, we identified three elements essential to the establishment of a prima facie case in strict liability pursuant to 402A:
(1)  The product was in a defective condition, "unreasonably" dangerous to the user or consumer;

(2)  The defect caused the accident and injuries complained of; and

(3)  The defect is traceable to the defendant.

Brown, 576 P.2d at 716.
The Chemical Companies argue that if this Court recognizes the imputation of knowledge doctrine, rather than the state-of-the-art defense, we will eliminate all of the elements that a plaintiff must prove to establish a strict products liability cause of action. Specifically, the Chemical Companies assert that the imputation of knowledge doctrine removes a plaintiff's burden of proving that a defect in the product caused the injury. In effect, the Chemical Companies are arguing that adoption of the imputation of knowledge doctrine will transform strict liability into absolute liability.  We disagree. From the time we initially adopted strict products liability, we have reassured defendants that strict liability is not absolute liability:
The adoption of the doctrine of strict liability does not relieve the plaintiff from the burden of proving his case.  Vital to that proof is the necessity of proving the existence of a defect in the product and that such defect caused the injury complained of.

Brandenburger, 513 P.2d at 274.  We explained again, in Brown, that by imposing upon a plaintiff the burden of proving a traceable defect, causation, and damage or injury, even with a flexible rule of evidence, we assured "an appropriate limitation to a manufacturer's liability."  Brown, 576 P.2d at 717.  This has not changed.
Under the imputation of knowledge doctrine, which is based on strict liability's focus on the product and not the manufacturer's conduct, knowledge of a product's undiscovered or undiscoverable dangers shall be imputed to the manufacturer.  Our adoption of the imputation of knowledge doctrine, and concomitant rejection of the state-

of-the-art defense, does not change the requirements of plaintiff's prima facie case; it only reinforces our commitment to provide the maximum protection for consumers, while still assuring "an appropriate limitation to a manufacturer's liability."

In fact, for the past two-plus decades, we have consistently adhered to the core public policy principles underlying strict products liability as set forth in both Brandenburger and Brown. As stated in the certified question, state-of-the-art evidence is used to establish whether the manufacturer knew or through the exercise of reasonable human foresight should have known of the dangers inherent in his product. That is, the state-of-the-art defense raises issues of reasonableness and foreseeability--concepts fundamental to negligence law--to determine a manufacturer's liability. To recognize the state-of-the-art defense now would inject negligence principles into strict liability law and thereby sever Montana's strict products liability law from the core principles for which it was adopted--maximum protection for consumers against dangerous defects in manufactured products with the focus on the condition of the product, and not on the manufacturer's conduct or knowledge.

Contrary to the Chemical Companies' assertion, our references to Comment j and our use of certain ambiguous language in previous case law does not support a conclusion that we have adopted the state-of-the-art defense. As discussed below, we conclude that in none of our prior cases was the state-of-the-art defense raised as an issue, much less adopted. Rather, these cases illustrate our strict adherence to the remedial policies underlying strict liability and our recognition of the basic differences between strict liability and negligence principles.

Attempting to demonstrate that we have adopted the state-of-the-art defense, the Chemical Companies cite to Rost and note that we referenced Comment j, and thereafter stated:

Plaintiffs contend that this duty to warn is measured by an objective standard, the care which would be exercised by a reasonable seller or expected by the ordinary consumer. This standard focuses on the condition of the product and the degree of danger which would be tolerated by the reasonable manufacturer [who], apprised of the danger, would not sell the product without a warning.

Rost, 616 P.2d at 385 (citing Phillips v. Kimwood Machine Co. ( Or. 1974), 525 P.2d 1033, 1036-37) (emphasis added) (other citations omitted). The Chemical Companies assert that this language is synonymous with the state-of-the-art defense, and, therefore, that we recognized the state-of-the-art defense in Rost. We disagree. Rather, in making this assertion, the Chemical Companies take the language in Rost out of context from the authority cited.

To explain the nature of the duty to warn standard that the plaintiffs in Rost asserted, we cited Phillips. The Oregon Supreme Court stated in Phillips that to prevent strict liability from becoming absolute liability, a test for unreasonable danger is necessary to show that something about a product makes it dangerously defective without regard to whether the manufacturer was at fault for the condition. Phillips, 525 P.2d at 1036.

A dangerously defective article would be one which a reasonable person would not put into the stream of commerce if he had knowledge of its harmful character. The test, therefore, is whether the seller would be negligent if he sold the article knowing of the risk involved. Strict liability imposes what amounts to constructive knowledge of the condition of the product.

Phillips, 525 P.2d at 1036. The Court in Phillips also explained that a difference exists between strict liability and negligence law because a product could be unreasonably dangerous even though the manufacturer's actions were reasonable in light of what he knew at the time he planned and sold the manufactured product. Phillips, 525 P.2d at 1037. Furthermore, the Oregon Supreme Court explained that a way to determine if a product is unreasonably defective, is to assume that the manufacturer knew of the product's potential dangers and then ask whether a manufacturer with such knowledge should have done something about the danger before the product was sold. Phillips, 525 P.2d at 1037. When viewed in this context, it is apparent that this portion of the Phillips

opinion to which we cited in Rost does not support the state-of-the-art defense, but rather describes the imputation of knowledge doctrine.

Moreover, after citing Phillips, we further distinguished strict liability from negligence law and reiterated the public policy supporting strict products liability:

This strict duty mandated by the theory of strict liability is warranted even though in some situations it may result in liability being imposed upon careful manufacturers. Unforeseeable product defects often cause severe physical injuries to members of the public. The manufacturer can distribute the risk from such accidents among the body of consumers, while the individual consumer must bear the financial burden alone. Placing the risk of loss on the manufacturer provides an incentive to design and produce fail-safe products which exceed reasonable standards of safety. Phillips, supra, 525 P.2d at 1041. Nor can we ignore the fact that a manufacturer with research capabilities can anticipate hazards better than unsophisticated purchasers. Strict liability has its underpinnings in public policy.

Rost, 616 P.2d at 386 (other citations omitted).

As in Rost, one portion of our opinion in Kuiper v. Goodyear Tire & Rubber Co. (1983), 207 Mont. 37, 673 P.2d 1208, seems to support an argument that we recognized the state-of-the-art defense. In Kuiper, we concurred with the trial court's opinion denying defendant's motion for new trial and quoted a portion of that opinion which provided in pertinent part:

There is no requirement that a design remain in substantially the same condition since obviously the design of the product does not change from the date of its original manufacture, absent some modification in design which was not an issue in this case.

[I]t is the [trial] court's concerted opinion that in a [product liability] design case, the changes in the product through wear, tear, or even abuse do not affect the question of whether the original design was defective and unreasonably dangerous. Design is judged not by the condition of the product, but the state of scientific and technical knowledge available to the designer at the time the product was placed on the market.

Kuiper, 673 P.2d at 1221 (third alteration in original) (emphasis added).

To conclude, however, that the emphasized language illustrates our adoption of the state-of-the-art defense is again to read this language out of context. Rather, when viewing the language in context with the trial court's opinion, it is obvious that the trial court was explaining the nature of design defect cases. That is, the trial court was explaining that, in a design defect case, a plaintiff is not required to show that the product was in substantially the same condition at the time of injury as when the product left the manufacturer. Kuiper, 673 P.2d at 1221. This requirement is not necessary because the changes in the condition of the product due to regular use or abuse are irrelevant as the design itself does not change after the product leaves the manufacturer. Kuiper, 673 P.2d at 1221. Consequently, the issue addressed by the trial court did not involve the state-of-the-art defense, and, therefore, our concurrence with the trial court cannot be read as our adoption of the state-of-the-art defense. That was not the issue in Kuiper.

Rather, in Kuiper we reiterated the public policy supporting strict liability as set forth in Brandenburger and Brown:

On whatever theory, the justification for strict liability has been said to be that the seller [manufacturer], by marketing his product for the use and consumption, has undertaken and assumed a special responsibility toward any member of the consuming public who may be injured by it; that the public has a right and does expect, in a case of products which it needs and for which it is forced to rely on the seller [manufacturer], that reputable sellers [manufacturers] will stand behind their goods; that the public policy demands that the burden of accidental injuries caused by products intended for consumption to be placed upon those who market them, and be treated as a cost of production against which liability insurance can be obtained;

and that the consumer of such products is entitled to the maximum of protection at the hands of someone, and the proper persons to afford it are those who placed the product in the market.

Kuiper, 673 P.2d at 1222 (quoting Restatement (Second) of Torts 402A, cmt. c (1965). We also explained that the law of strict liability recognizes that the seller [manufacturer] is in the best position to insure product safety. Kuiper, 673 P.2d at 1222. Therefore, under strict liability, a seller [manufacturer] has a duty to prevent the release of any product in a defective condition unreasonably dangerous "into the stream of commerce." Kuiper, 673 P.2d at 1222. Furthermore, we distinguished this duty under strict liability from the law of negligence.

This duty is unknown in the law of negligence and it is not fulfilled even if the seller takes all reasonable measures to make his product safe. The liability issue focuses on whether the product was defective and unreasonably dangerous, not only upon the conduct of the user or seller.

Kuiper, 673 P.2d at 1222.

Subsequently, in Rix v. General Motors Corp. (1986), 222 Mont. 318, 723 P.2d 195, and in Krueger, we stated that, in a specific category of design defect cases, evidence of the technological knowledge about dangers in a design and the existence of alternative safer designs at the time of manufacture may be admitted. However, we expressly limited these opinions to cases where the alternative designs were available at the time the product at issue was manufactured.

We do not attempt to set forth an analysis which addresses all facets of strict liability under a design defect theory. We render an opinion only with regard to the following facet of defect: Was the GMC single brake system defective and unreasonably dangerous in view of the fact that a dual brake system was technologically feasible at the time of manufacture and was offered by GMC for sale? We do not rule upon the fact situation where a claim of design defect is made and where no alternative design is technologically feasible. See O'Brien v. Muskin Corp. (N.J. 1983), 463 A.2d 298 [holding that state-of-the-art evidence is relevant to a risk-utility analysis and admissible in a strict liability case involving defectively designed products].

Rix, 723 P.2d at 201 (emphasis added). Likewise in Krueger, we relied on the limitations imposed in Rix and held that to determine the defectiveness of the transfer case design at issue, only evidence concerning other transfer case designs available at the time the transfer case at issue was manufactured would be admissible. Krueger, 783 P.2d at 1345.

Similarly, in a case prior to Rix, we held that a trial court erred in refusing to instruct the jury concerning plaintiff's central contentions that compression rollers in defendant's hay balers were an unnecessary hazard and that defendant enhanced injuries by failing to provide an emergency stop device. Tacke, 713 P.2d at 534. In Tacke, plaintiff presented evidence that open-throat, non-compression balers eliminated a place where humans could be injured and that these non-compression balers were technologically available at the time plaintiff purchased a baler containing the compression rollers which injured him. We held that the trial court's failure to give an instruction which included the issue of an unnecessary hazard amounted to a directed verdict and denied plaintiff's right to have jury instructions which are adaptable to his theory of the case. Tacke, 713 P.2d at 534.

The Chemical Companies argue that the plaintiff in Tacke offered state-of-the-art evidence on the issue of feasibility in a design defect case. The Chemical Companies assert that if a plaintiff may offer such evidence, then we should also permit a defendant to do so. We disagree. Like the fact situations in both Rix and Krueger, the plaintiff in Tacke offered evidence of existing alternative designs, and, therefore, such evidence was admissible to prove a product's defectiveness. In both Rix and Krueger, we expressly limited the admissibility of evidence concerning alternative designs to situations where those designs existed at the time of manufacture. Furthermore, while we allowed the plaintiff to present this evidence in Rix and Krueger, we did not require it as a part of plaintiff's prima facie case.

We decline to extend this rule to cases where alternative designs did not exist and a product's dangers were undiscovered or undiscoverable at the time of manufacture. If we were to do so, we would inject negligence concepts into Montana's strict products liability law and eviscerate the public policy underlying strict products liability law in this State. Therefore, we hold that the rule employed in Tacke and expressly stated in Rix and Krueger is limited to situations where alternative designs existed at the time of manufacture.

Alternatively, the Chemical Companies argue that even if the cases, discussed above, do not show that Montana has adopted the rule allowing state-of-the-art evidence, we should do so now based on the experience of other jurisdictions which favor the adoption of the rule. After discussing numerous cases from other jurisdictions, the Chemical Companies contend that an overwhelming majority of jurisdictions that have adopted 402A also admit state-of-the-art evidence. Additionally, the Chemical Companies argue that the Restatement (Third) of the Law of Torts: Products Liability (Proposed Final Draft, Preliminary Version) (Oct. 18, 1996) would also allow state-of-the-art evidence. Furthermore, the Chemical Companies assert that public policy supports adoption of the state-of-the-art defense.

Despite the adoption of the state-of-the-art defense in other jurisdictions, recognition of the defense in the Restatement (Third) of the Law of Torts: Products Liability (Proposed Final Draft, Preliminary Version) (Oct. 18, 1996) and the Chemical Companies' assertion that public policy supports adoption of the defense, we choose to continue to adhere to the clear precedent we have heretofore established which focuses on the core principles and remedial purposes underlying strict products liability. Strict liability without regard to fault is the only doctrine that fulfills the public interest goals of protecting consumers, compensating the injured and making those who profit from the market bear the risks and costs associated with the defective or dangerous products which they place in the stream of commerce. See Brandenburger, 513 P.2d at 273. As we discussed previously, no Montana case supports the Chemical Companies' position that state-of-the-art evidence is admissible when a product's inherent dangers are undiscovered or undiscoverable.

In fact, both our case law and statutory law make it clear that even careful manufacturers may be strictly liable for unreasonably dangerous products whose dangers could not be foreseen. See Rost, 616 P.2d at 386, and 27-1-719(3)(a), MCA. Moreover, given strict liability's focus on the product and not on the manufacturer's conduct, knowledge of any undiscovered or undiscoverable dangers should be imputed to the manufacturer. That is, while a plaintiff must still prove the three prima facie elements set forth in Brown, evidence that a manufacturer knew or through the exercise of reasonable human foresight should have known of the dangers inherent in his product is irrelevant. See Phillips, 525 P.2d 1036-37.

Accordingly, in answer to the question certified, we conclude that, in a strict products liability case, knowledge of any undiscovered or undiscoverable dangers should be imputed to the manufacturer. Furthermore, we conclude that, in a strict products liability case, state-of-the-art evidence is not admissible to establish whether the manufacturer knew or through the exercise of reasonable human foresight should have known of the danger.

/S/ JAMES C. NELSON

We Concur:

/S/ J. A. TURNAGE
/S/ KARLA M. GRAY
/S/ JIM REGNIER
/S/ TERRY N. TRIEWEILER
/S/ W. WILLIAM LEAPHART
/S/ WILLIAM E. HUNT, SR.