JUSTICE NELSON
dissents.
Introduction
¶3 3 As the maj ority opinion points out, resolution of the issue on appeal presents a practical dilemma of choosing between two competing public policies — one favoring settlements and the other favoring placing responsibility upon the “up stream” manufacturer of a defective product notwithstanding that the manufacturer is released from liability by the injured plaintiff. In the context of this case — a strict products liability action — I cannot agree with the Court that the former policy must take precedence over the latter. To the contrary, I conclude that the latter policy must control. Indeed, the majority’s resolution of the policy issue flies directly in the face of this Court’s long-standing, consistent adherence to the core principle of strict liability in tort — that of placing liability on the party primarily responsible for the injury occurring. Our decision significantly compromises this principle and disserves the consuming public for whose protection we adopted the doctrine of strict products liability in the first place. Accordingly, I respectfully dissent.
Discussion
¶34 Montana adopted the doctrine of strict liability in tort in Brandenburger v. Toyota Motor Sales U.S.A., Inc. (1973), 162 Mont. 506, 513 P.2d 268. We did so based upon important public policy considerations to which we have consistently adhered for the past two-plus decades. Sternhagen v. Dow Co. (1997), 282 Mont. 168, 174, 935 P.2d 1139, 1142. Specifically, “the doctrine of strict liability was *329 evolved to place liability on the party primarily responsible for the injury occurring, that is, the manufacturer of the defective product.” Brandenburger, 162 Mont at 514, 513 P.2d at 273 (quoting Lechuga, Inc. v. Montgomery (1970), 12 Ariz. App. 32, 467 P.2d 256, 261 (Jacobson, J., concurring)).
¶35 The important public policy considerations which we articulated in Brandenburger in support of our adoption of the strict liability doctrine include:
1. The manufacturer can anticipate some hazards and guard against their recurrence, which the consumer cannot do.
2. The cost of injury may be overwhelming to the person injured while the risk of injury can be insured by the manufacturer and be distributed among the public as a cost of doing business.
3. It is in the public interest to discourage the marketing of defective products.
4. It is in the public interest to place responsibility for injury upon the manufacturer who was responsible for [the defective product] reaching the market.
5. This responsibility should also be placed upon the retailer and wholesaler[1] of the defective product in order that they may act as the conduit through which liability may flow to reach the manufacturer, where ultimate responsibility lies.
6. Because of the complexity of present day manufacturing processes and their secretiveness, the ability to prove negligent conduct by the injured plaintiff is almost impossible.
7. The consumer does not have the ability to investigate for himself the soundness of the product.
8. The consumer’s vigilance has been lulled by advertising, marketing devices and trademarks.
Brandenburger, 162 Mont. at 514-15, 513 P.2d at 273 (citations omitted).
¶36 Summarizing these policy considerations, we stated:
[t]he essential rationale for imposing the doctrine of strict liability in tort is that such imposition affords the consuming public the *330 maximum protection from dangerous defects in manufactured products by requiring the manufacturer to bear the burden of injuries and losses enhanced by such defects in its products.
Brandenburger, 162 Mont. at 517, 513 P.2d at 275. Furthermore, in the twenty-plus years since we adopted the doctrine we have steadfastly rejected attempts by others to
inject negligence principles into strict liability law and thereby sever Montana’s strict products liability law from the core principles for which it was adopted — maximum protection for consumers against dangerous defects in manufactured products with the focus on the condition of the product, and not on the manufacturer’s conduct or knowledge.
Sternhagen, 282 Mont. at 176, 935 P.2d at 1144 (holding that “state-of-the-art” evidence is not admissible in a strict products liability action).
¶37 Indeed, we have chosen
to continue to adhere to the clear precedent we have heretofore established which focuses on the core principles and remedial purposes underlying strict products liability [because] [sjtrict liability without regard to fault is the only doctrine that fulfills the public interest goals of protecting consumers, compensating the injured and making those who profit from the market bear the risks and costs associated with the defective or dangerous products which they place in the stream of commerce.
Sternhagen, 282 Mont. at 182, 935 P.2d at 1147 (citing Brandenburger, 513 P.2d at 273).
¶38 Recognizing this Court’s adherence to these core principles, the federal district court in Jones v. Aero-Chem Corp. (D. Mont. 1987), 680 F. Supp. 338, had no difficulty in concluding that allowing actions for indemnity in strict products liability cases was entirely consistent with Montana’s strong commitment to the protection of the consuming public. The federal district court was entirely correct in its conclusion.
¶39 In Aero-Chem, the plaintiff, Jones, sued the manufacturer of a defective tear gas canister, Aero-Chem, for injuries she sustained when the canister accidentally discharged. By way of a third party action, Aero-Chem sought indemnity from the designer/manufacturer of a defective valve incorporated into the canister, Emson. Aero-Chem, 680 F. Supp. at 338- 39. The court denied Emson’s motion for summary judgment noting, first, that, while we had not addressed *331 the question, “[t]he decisional law extant in Montana ... provides clear guidance as to what the Montana Supreme Court would conclude if presented with the precise issue.” Aero-Chem, 680 F. Supp. at 339. Pointing to our “unequivocal]” adoption of Section 402A of the Restatement of Torts in Brandenburger and to our adoption of the equitable principle of indemnity in Poulsen v. Treasure State Industries, Inc.(1981), 192 Mont. 69, 82, 626 P.2d 822, 829, the court found the two theories perfectly compatible:
The principle of indemnity, like the doctrine of strict products liability, is bottomed on the desire of the public to impose liability for an injury on the person or entity primarily responsible for that injury.
Recognition of the fact that the doctrine of strict products liability and the principle of indemnity are premised on the same public concern, leads to the logical conclusion that the public interest is best served by allowing indemnity based on the principle of strict products liability. There is nothing inherent in the principle of indemnity which makes it inapplicable to strict products liability actions, nor visa versa. Not only are the principles compatible but they both serve to accomplish the same result.
“[U]pstream” indemnification fosters the policy behind strict products liability by placing final responsibility for injuries caused by a defective product upon the entity initially responsible for placing that product into the stream of commerce.
Aero-Chem, 680 F. Supp. at 339-40.1 completely concur in this rationale.
¶40 Indeed, as pointed out above, in Brandenburger this Court observed that by allowing the injured consumer to hold retailers of the defective product also responsible, those entities may, thereby, serve as an effective “conduit” through which liability may flow to reach the manufacturer, where ultimate responsibility lies. Brandenburger, 162 Mont. at 514, 513 P2d at 273. Obviously, this important policy reason for adopting strict liability in tort is completely frustrated to the extent that the retailer is prohibited from seeking indemnification from the manufacturer. Quite to the contrary, the “ultimately responsible” manufacturer can, via settlement, effectively shift the damages caused by its placing the defective product into the stream of commerce to downstream retailers who did nothing more than un *332 wittingly sell the defective product to the consumer. See Aero-Chem, 680 F. Supp. at 340.
¶41 Furthermore, allowing the manufacturer of a defective product to “buy its peace” serves as a disincentive for it to “anticipate ... hazards and to guard against their recurrence.” Brandenburger, 156 Mont. at 514, 513 P.2d at 273 (citation omitted). Why spend the money to design and build a safer product, when the manufacturer’s economists and accountants can demonstrate that it will cost less in the long run to simply settle the few law suits that will inevitably result from injuries caused by the defective product, without incurring any risk of having to indemnify downstream defendants?
¶42 Rather than “discouraging] the marketing of defective products” and requiring the manufacturer to insure the risk of injury and distribute that expense among the public as a cost of doing business," see Brandenburger, 162 Mont. at 514, 513 P.2d at 273, our decision in the case sub judice even more will encourage manufacturers to do what they already do— analyze decisions to market or to continue marketing defective products on the basis of the cost/benefit ratio. That is, if the accounting department can show that the manufacturer will likely have to pay $1.50 per unit to settle anticipated personal injury cases caused by the product’s defective design or fabrication, but that it will cost $2.75 per unit to make the product safer, the benefit of marketing the defective product will outweigh the cost of improving it. The result? The manufacturer will continue to market the product with the defect. So what if a few hundred or a few thousand people a year are killed or maimed by the product? At least profits will be maximized!
¶43 Adopting a public policy of allowing the manufacturer in a strict products liability case to “buy its peace” one case at a time without risk of indemnity may well benefit the individual plaintiff. Such a policy does absolutely nothing, however, to uphold, much less advance, the core principles of strict liability in tort — that of protecting the consuming public and placing ultimate financial responsibility on the manufacturer. Under such a policy the individual plaintiff may win the battle but the consuming public will most assuredly lose the war.
¶44 Likewise, allowing the “ultimately responsible” manufacturer to settle out of a products liability case free of any risk of a later indemnity action fails to foster the other public policy considerations articulated in Brandenburger. What will force a manufacturer to disclose complicated manufacturing processes or damning, secret, *333 intra-organization test reports or memoranda concerning its defective product if the manufacturer can place the product into the stream of commerce knowing full well that it can settle out of individual lawsuits with no risk of ever having its ultimate responsibility determined? What will protect other consumers who have no more ability than the injured plaintiff to investigate the soundness of the product and who are, likewise, lulled by advertising, marketing devices and trademarks, from the manufacturer’s cost/benefit-driven decision to continue marketing the defective product? See Brandenburger, 162 Mont. at 515, 513 P.2d at 273.
¶45 Having adopted the theory of strict liability in tort for the purpose of assuring that liability for putting a defective product into the stream of commerce is placed on the party primarily responsible for the injury occurring, that is, on the manufacturer, I can discern absolutely no way in which our instant decision fosters that or any of the other important public policy considerations articulated in Brandenburger or in our subsequent products liability case law. In fact, as pointed out above, the reverse is true.
¶46 In short, as the federal court in Aero-Chem correctly stated:
No compelling justification exists which warrants relieving the manufacturer of a defective product from responsibility for damages caused by that entity’s product. Ultimate liability for injury emanating from a defective product should be placed upon that entity responsible for creation of the product, [citation omitted]. Ultimate responsibility should not be fixed simply by the fact that an injured consumer chooses to seek compensation from one commercial entity rather than another.
Aero-Chem, 680 F. Supp. at 341. A more enlightened approach would allow a downstream retailer of a defective product or defective component part of a product to seek indemnity from the upstream manufacturer of the product or component part.
¶47 The majority rejects this approach, however. Rather, the Court trumpets policy reasons for encouraging settlements and avoiding “unnecessary” litigation — i.e. reducing costs, eliminating the risk of extreme verdicts, lessening trial stress, and efficiently using judicial resources. No doubt these are legitimate policy reasons favoring settlements in negligence actions and in many other sorts of lawsuits. As facially persuasive (though speculative) as they are, however, these reasons are antithetical to the core principles of strict liability in tort articulated at length above.
*334 ¶48 The essential rationale of strict products liability is to benefit the consuming public, not the individual plaintiff. We adopted strict liability in tort to “afford the consuming public the maximum protection from dangerous defects in manufactured products by requiring the manufacturer to bear the burden of injuries and losses enhanced by such defects in its products.” Brandenburger, 162 Mont. at 517, 513 P.2d at 275. To this end, we will not permit manufacturers to use the “state-of-the-art” defense in strict products liability actions because to do so, “would inject negligence principles into strict liability law and thereby sever Montana’s strict products liability law from the core principles for which it was adopted — maximum protection for consumers... with the focus on the condition of the product, and not on the manufacturer’s conduct or knowledge.” Sternhagen, 282 Mont. at 176, 935 P.2d at 1144.
¶49 Yet, in the case at bar, we are content to throw these core, remedial principles to the wind in favor of some theoretical benefit to some future plaintiff[2] who, for whatever reason, chooses to settle with the manufacturer of the defective product leaving the retailer — merely a “conduit” to the “ultimately responsible” manufacturer — to shoulder the financial burden. True, maybe the plaintiff will not have to try part of his or her case; maybe he or she can obtain, via the settlement, some seed money to finance the remaining claim against the retailer; maybe some trial costs will be saved; and maybe some judicial resources will be conserved. Nevertheless, given the lofty reasons why we adopted the theory of strict liability in tort, I am mystified by our present about-face, rejection of these core principles. There simply is no justification for our determination that a few speculative benefits which might accrue to one plaintiff should trump the very real and greater benefit of protecting all consumers from dangerous product defects. Nor should we preclude the fact-finder from determining the manufacturer’s liability and, if found to be responsible, from holding it financially accountable in a suit for indemnification.
¶50 And, that is not all that is wrong with this picture. As much as the majority tries to pound the square peg of settlement — by application of State ex. rel. Deere & Co. v. District Court (1986), 224 Mont. 384, *335 730 P.2d 396 — into the round hole of strict liability in tort, its attempt is unavailing. The Court tries to distance the case from its roots, but the fact is Deere was decided as a negligence/comparative negligence case under § 27-1-703, MCA, not as a strict liability case under § 27-1-719, MCA. See Deere, 224 Mont. at 393, 730 P.2d at 402. Even the trial court acknowledged that Deere was not directly on point.
¶51 In Deere, the plaintiff was injured by a bulldozer manufactured by Deere and operated by Wade’s Backhoe. Plaintiff’s complaint alleged that Deere negligently designed the bulldozer and that Wade’s Backhoe negligently operated it. Plaintiff settled with Deere. Wade’s Backhoe then filed a third party complaint for indemnity and contribution against Deere. Count one of the third party complaint alleged strict liability for defective manufacture against Deere; counts two and three alleged negligent design and failure to warn. On denial of its motion for summary judgment based on settlement, Deere applied for, and we accepted supervisory control. Deere, 246 Mont. at 386, 730 P.2d at 398.
¶52 We decided Deere on the issue of whether the third party complainant, Wade’s Backhoe, could bring an action for contribution against the settled and released joint tortfeasor, Deere. See Deere, 246 Mont. at 387, 730 P.2d at 399.[3] Following a lengthy discussion and review of Montana’s negligence law we resolved the issue in Deere’s favor, citing § 27-1-703, MCA. We stated:
In Montana, there is but one statute on the subject, the amended Sec. 27-1-703, MCA, and from it we determine that a joint tortfeasor who settles with the claimant before judgment on the claim is entered in a district court is not subject to claims for contribution or indemnity from the non-settling joint tortfeasors against whom judgment may be rendered. Even though the amended section does give a sued joint tortfeasor the right to bring in other joint tortfeasors as defendants in order to insure contribution, and even though the section states that the trier of fact is to determine the degree of negligence among each of the joint tortfeasors, the right of contribution under the amended statute is “proportional to the negligence of the parties against whom recovery is allowed.” Clearly *336 that statutory language excludes a party against whom recovery is not allowed, e.g. a tortfeasor who has previously settled.
Deere, 224 Mont. at 393, 730 P.2d at 402 (emphasis added). Thus, contrary to the majority’s pronouncement that Deere was resolved on “common law principles and was not dependent on the language of § 27-1-703, MCA,” the opposite is true. In fact, the contribution issue was reviewed, discussed and decided by this Court entirely within the context of negligence and comparative negligence principles and was clearly decided by reference to the negligence/comparative negligence statute. Importantly, absolutely no reference was made to the strict liability statute, § 27-1-719, MCA, adopted years before.
¶53 Again, in applying Deere to the strict products liability case at bar, the majority has simply ignored this Court’s consistent rejection of attempts to inject negligence principles into strict liability in tort and its steadfast refusal to sever Montana’s strict products liability law from its core, remedial principles of providing maximum protection to consumers of defective products and placing financial responsibility on the “ultimately responsible” manufacturer regardless of its conduct or knowledge. Sternhagen, 282 Mont. at 176, 935 P.2d at 1144. The majority does not stop there, however.
¶54 Recognizing that indemnity “shifts the entire loss from the one who has been required to pay it to the one who should bear the loss” — precisely the underlying rationale of strict liability in tort — the Court then goes on to disallow indemnity actions in strict liability cases. With passing reference to Deere (which, as demonstrated above, is completely inapplicable) and with lip-service to Brandenburger (which is what this case is actually about), the majority, without further authority or any real analysis, rejects indemnity in strict liability cases, concluding that to allow such actions would discourage settlements. Assuming that is true, so what? As previously discussed, this whole approach is bogus in the context of a strict liability case. The Court’s overarching concern for settlements is misplaced.
¶55 Moreover, I take particular exception to the majority’s statement that the consuming public has little interest in who pays for the damages caused by the use of a defective product but that the public has a strong interest in seeing that the injured person is compensated for his or her injuries. Actually, the public wants defective and dangerous products removed from this nation’s store shelves so that members of the public will not be injured. The plaintiff wants to be *337 compensated. Where that compensation comes from is immaterial to the plaintiff. Strict liability in tort was adopted to serve both goals. Brandenburger, 162 Mont. at 514-15, 513 P.2d at 273. Settlement serves only the latter.
¶56 And that is precisely the point that seems to be lost on the majority. Allowing upstream indemnity actions will not preclude the injured plaintiff from ultimately obtaining full compensation for his or her injuries. While the plaintiff may actually have to try the case, juries are more than willing to fairly compensate injured plaintiffs for injuries in products liability cases. In fact, if anything, modern experience demonstrates that in products liability cases, trial juries award not only substantial compensatory damages, but, often, punitive damages as well — especially where manufacturers are shown to have callously disregarded issues of product safety. (And, if that were not true, “tort reformers” would not be falling all over themselves to put caps on damages and to deny Americans meaningful access to the courts and to full legal redress for their injuries).
¶57 Moreover, allowing indemnity actions in strict liability cases may actually promote settlements. Retailers may be more willing to settle if those entities know that they can seek indemnity from the upstream manufacturer. Similarly, manufacturers, knowing that they will have to indemnify downstream retailers, will likely be more inclined to make good faith settlement offers, rather than simply “buying their peace” for bottom dollar.
Conclusion
¶58 Allowing indemnity actions in the context of product liability cases serves the precise goals for which we adopted strict liability in tort in the first place — maximum protection for consumers against dangerous defects in manufactured products with financial responsibility being placed on the “ultimately responsible” entity that placed the defective product into the stream of commerce. Disallowing indemnity actions by application of negligence/settlement principles in products liability cases disserves and frustrates these goals. Moreover, it is as likely that settlements will be promoted by allowing indemnity actions as it is that settlements will be discouraged. However, even accepting at face value the majority’s rationale that settlements will be more difficult, the possibility of lessening a plaintiff’s opportunities for settlement without diminishing his or her ultimate right of full legal redress is a reasonable price to insure the greater public good.
*338 ¶59 I would reverse the decision of the District Court, and I respectfully dissent from our failure to do so.
DISTRICT JUDGE PREZEAU, sitting for JUSTICE LEAPHART, concurs in the foregoing dissent.

. Throughout the remainder of this dissent I refer only to “retailers” rather than “retailers and wholesalers” except where the dual reference is made in quoted material. I do this only for stylistic reasons. Obviously, under our products liability law, retailers and wholesalers can be held equally liable since both are in the stream of commerce.

. Ironically, the Plaintiffs in the instant case will be neither helped, nor harmed by our decision. They have already settled with everybody. In this case the winner is the manufacturer of the defective product and the losers are the downstream defendants and the consuming public.

. We also considered whether Wade’s Backhoe’s indemnity claim mandated keeping Deere in the suit. We concluded, however, that the third party complainant had not stated a cause of implied indemnity as a matter of law. Deere, 246 Mont. at 398-99, 730 P.2d at 405-06.